Alexander Del Giorno, J.
These two claims, arising out of the same appropriation, were timely filed after the date of vesting, namely, May 10, 1961. The claimants’ interests have not been assigned. The two cases, upon affirmance by the Appellate Division of an order of consolidation made by a Judge of this court, were consolidated for the purpose of this trial, but separate awards are to be rendered. Other facts pertaining to these claims will be set out in the decision. The findings of fact and conclusions of law submitted by the several parties have been passed upon in accordance with this decision which likewise denies or grants motions made during the trial upon which decision was reserved.
On January 4, 1961, claimant Banner Holding Corp. leased from claimants Siegel, et al., the vacant 26.783-acre subject premises, for a term of 25 years with three 25-year renewal options. The first year rental was $30,000. After the first year the rental provided for 24 years was $61,250 per annum, thus making the average rent $60,000 annually. All rents were net to the landlord. As set forth in the lease, its purpose was to permit construction by lessee claimants of a large regional shopping center to be occupied by E. J. Korvette for whom Banner *936 had erected, upon terms generally similar, some 11 other shopping centers. The pertinent portions of paragraphs 4, 5, 27 are:
“4. Construction: Tenant may erect such buildings and improvements on the leased premises including (but without limitation) those provided for in the Korvette sublease ”.
“ 5. Building Permit and Financing. Tenant agrees to use due diligence to apply for and obtain a building permit from the Town of Clarkstown to erect certain buildings as provided in said Korvette sublease promptly following agreement on the plans and specifications for said buildings between Tenant and the sublessee ’ \
‘ ‘ 27. Korvette Sublease. Tenant expects to enter into an agreement of sublease for the premises herein leased to Tenant with E. J. Korvette, Inc., a New York corporation, as sublessee.
“ Said Korvette Sublease may be modified or amended by the parties thereto only with the written consent of Landlord The remaining option term for which the rent was to be from $60,000 to $90,000 net per year was to be determined according to a cost of living index agreement which was attached to the lease. The tenant also had an option to purchase the fee at a price over and above the then existing mortgage starting at $31,000 an acre from the 11th to 15th year, $32,000 an acre from the 15th to the 20th year, to $33,000 an acre from the 21st to the 25th year.
Thereafter, the claimant Banner Holding Corp., on March 7, 1961, entered into three separate subleases with Korvette, encompassing 20 acres of the entire property under lease to Banner, with certain reservations as to the 6.783 acres. By the terms of these subleases, Banner was obliged to erect at its own expense a large discount department store, supermarket, patio shop and parking area as the basic obligation it assumed regarding the 20 acres (Parcel 1) for which Korvette would pay to Banner an annual net rental of $285,000. These structures, to be erected for occupancy by Korvette, were to contain a total area of 165,200 square feet, while the parking lot had to be improved with black top, lights, etc. Each of these subleases was for a term of 25 years, with two 10-year options to renew. At that time, it was contemplated by the parties that Korvette would release one of the other parcels contained in the 6.783 acres to Banner to permit erection by Banner of satellite stores in the Korvette operation.
Claimant Arlen of Nanuet, Inc., is the assignee of Banner for which reason the claim of Banner Holding Corp. is hereby dismissed.
*937 As a result of the appropriation on May 10, 1961, of 16 acres of the demised premises, which divided the unappropriated premises into two separate tracts, and in accordance with the provisions of the lease and subleases, all leases were cancelled by written notice, first by Korvette on May 25, 1961, and then by Arlen on May 26, 1961.
The individuals controlling Banner and Arlen of Nanuet are the same as those who, in name of Arlen Operating Corp., at the date of the instant appropriation, owned a leasehold of adjacent lands to the west of Smith Street, which street forms the westerly boundary of subject property. The adjacent parcel is known as the “ Built On ” parcel. It contains 25 acres and is quite similar to the subject parcel in frontage and topography. When first acquired, this 25-acre parcel had been destined by Arlen Operating Corp. as a site for a Korvette Shopping Center. However, Arlen ran into immediate difficulties with regard to the parcel known as “ Dellacroce ” parcel which was in the very middle of the assemblage. Later, Arlen, upon payment of a very high price, plus an exchange of land, obtained the Dellacroce parcel. While thus stymied, and doubtful as to whether Dellacroce would sell, Arlen showed the subject parcel to the president of Korvette, who was very desirous of locating in Nanuet. Korvette became enthusiastic about the subject property and gave Banner the “ go ahead ” signal to acquire it. On this 25-acre or “ Built On ” parcel, however, since the original appropriation, Banner or Arlen have erected a shopping center similar to the one contemplated on the subject land (in fact making use where feasible of the plans originally drawn for Korvette for a portion of the subject land), except that the satellite leases, which had not been signed for the subject land on the date of the taking of the instant property, have been executed. As a result, Korvette, for the same buildings and land, is paying in rent the same $285,000 per year which it was to have paid on the appropriated site, and satellite tenants are paying additional rentals on additional buildings later erected, making the total net rents payable today on the “Built On” site in the sum of $356,000 per year.
Everyone agreed that Route 59 is a very important highway in Rockland County, perhaps the most important, for it runs from east to west, connecting Nyack on the east with Suffern on the west end of Rockland County with Nanuet in the middle.
The assemblage of the subject property by the Siegel group was accomplished by means of four deeds spaced in dates of purchase from January 28, 1960 to March 14, 1961, to Decision *938 Eealty Carp., which later conveyed the land to the Siegel group by deeds dated between October 18, 1960 and April 11, 1961. Decision Eealty Corp. was a nominee corporation wholly owned by the five individual claimants, which they used only as a front for the assemblage.
The subject land, lying on the south side of Route 59, had a frontage on Boute 59 of 1,150 feet, 240 feet on Bose Road on the east, and 289 feet on Smith Street on the west.
The land rose gently from an elevation of 28Q± feet along Boute 59 to 290± feet towards the rear of the plot on the south, and up to 304± feet on the east side near Bose Road, except that there was a low wet area starting about 100±: feet west of Rose Boad and near Bout.e 59 extending westerly for perhaps 300 feet and to the south maybe 300 feet more. In this low area there was stagnant water which was caused by an open drainage ditch which received water that emptied from a State culvert that ran from north to south under Boute 59, and which ditch coursed along the State’s southerly right of way of Boute 59. The elevation of the land along Boute 59 varies generally from 4 to 8 feet below the level of new Boute 59.
Upon viewing the property it seemed to the court that a cut and fill operation within the land itself might have filled the lowland and leveled off the high spots, with perhaps some additional fill required to fill the wet land and level off the frontage about even with Boute 59. Because of the size of the plot and the fact that the frontage area was destined for parking, a level two to four feet below the grade of Boute 59 would have been no detriment to its use.
As stated, Nanuet is located at about the geographical center of Bockland County. In addition to the benefit of frontage on Route 59, the subject property was accessible from all sections of Rockland County, such as Spring Valley, % mile away; Pearl Biver, 21/2 miles distant; New City, 1% miles away by means of Boute 59 and Boute 303, as well as from the Thruway, Garden State Parkway and Palisades Interstate Parkway, which were about % mile away.
Boute 59 had been reconstructed from the east before the appropriation as a four-lane highway, two lanes on each side of a wide, grassy mall, and has been extended to a point about one-quarter mile west of subject. From there, proceeding westerly, it is the same two-lane highway which has been there for many years.
The subject land which cost the Siegel group $248,000 to assemble was vacant except for a dilapidated house which all parties disregarded in their appraisals. The growth on the land con *939 sisted of brush and second-generation trees, easily bulldozed away. The land was clay and gravel. There was a gravel road from Smith Street to the now dilapidated house.
There is an underground gas transmission line running from Smith Street east and southeast, thence past the center of the south boundary line into and through other lands, a small portion of which line is left within the larger of the two remaining parcels.
The taking of 16.009 acres was without right of access. The portion taken may be likened to an inverted triangle with the base (821 feet) along Route 59, and the apex (134 feet) along the southwesterly boundary line. The remainder land is in two parcels, a quadrangular plot containing 1.40 acres of land, with a frontage of 289 feet along the east side of Smith Street, and a very irregular plot containing 9.374 acres located in the easterly area of the original plot. This plot has a frontage of 332 feet on Route 59 and 240 feet along Rose Road. Both Smith Street and Rose Road are paved streets.
Siegel testified that his group had studied the location with reference to the road pattern, population growth, and the triple road frontage enjoyed by the subject assemblage and, finding it to their satisfaction, assembled the parcel and proceeded to prepare a brochure showing the proposed extension of Route 304 to be running along Smith Street with a 300-foot buffer zone within their land. He testified, and was not contradicted, that this was the information they could garner at both the town office and the Poughkeepsie district office of the Department of Public Works.
Siegel also stated that his group contemplated a conventional shopping center with satellite stores.
The brochure brought inquiries for space which added to their concern regarding the course and extent of the new Route 304. As a result, they returned to the Department of Public Works office at Poughkeepsie to inquire regarding the line of the extended 304 Route and, assuming their freedom to go ahead with the shopping center, they also inquired regarding the curb cuts and lights location. Again, however, no one could give a definite answer as to what the State really would take of their land.
Because all kinds of rumors were being heard regarding the new extension of Route 304, they again returned to Poughkeepsie, and now Mr, Rauer, the engineer in charge of the district office, told them the line of extension of new Route 304 was indefinite and he could not say whether the buffer zone only would be taken or whether other portions of claimants ’ *940 property would be taken. Still, because they were now making tentative leases, Siegel was interested in a direct answer. Therefore, Siegel and his local lawyer, Mr. Eoepe, returned to Poughkeepsie on March 24, 1961. This time Mr. Noble, the engineer in charge of the right of way lines, said to them that he could give no definite information regarding this land and that it was only a matter of who got there first. Siegel and Eoepe advised Mr. Noble that they had Saks, Bamberger and many others ready to enter into leases and, if they went ahead, it might involve an investment of $3,000,000, for which reasons they were interested in a definite answer. They were told that if they proceeded with the shopping center the State would go around them by bringing their new Eoute 304 west of Smith Street. These negative results both in Poughkeepsie and in the town office were confirmed by Maurice Levien who is a nephew of Arthur Levien as well as the architect for Banner. He was told that the State had no drawings other than the pencil lines imposed on an aerial photo he was shown. Mr. Bauer, the Chief Engineer, also told him that the State would relocate the improvements to the roadway near their land if they built before the appropriation.
As a matter of fact, by letter of June 6, 1963, the Department of Public Works advised Mr. Marcus, trial counsel for Siegel, that as of that date plans for the relocation of Eoute 304 were incomplete.
Siegel testified that his group had written to Korvette, who, 90 days later, replied they were not interested in Siegel’s offer to Korvette to locate on subject land. Korvette’s later interest in the subject has been referred to. Apparently Korvette operated only through Banner.
At the time of the Banner lease, the land was zoned M-l (Manufacturing). Siegel co-operated with Banner on its petition for a change of zoning to C-2 (Commercial, Shopping Center, etc.) which was granted on April 24, 1961. Thus, on the date of the appropriation, the land was zoned C-2, and all the appraisers agreed that on the vesting date its highest and best use was for a regional shopping center.
Maurice Levien, the architect for claimant lessee, filed plans for the original three buildings which were approved May 8, 1961, two days before the State appropriated. The mortgage commitment had already been procured.
Cohen and Levien, the owners of the stock in Banner and Arlen, who had erected over 11 Korvette Centers as well as some 32 Spartan Shopping Centers either on land they owned or land they leased, have been in this business since 1939, and their *941 experience has brought about an intelligent, smoothly working organization which, in these days of highly competitive enterprise, makes the difference between success or lack thereof in the market place. To them, putting into effect their contemplated plan and all its incidental ramifications without waste of time is normal. To others, who are content with the dear old days when things developed clockwise and in respective sequence, these activities which seem almost automated, and the co-ordinated planning, preparation and execution thereof without waste of any time seem incomprehensible and almost suspect. This type of thinking is often evident in the manner of the attack or in the approach to values exhibited during the trial.
This was a highly complicated trial, but was excellently tried by all attorneys. The proof presents many problems, both as to value and as to apportioning of the interests of the parties. However, the greater problem is how to arrive at these results.
Where a feehold and a leasehold are involved, the normal, accepted method used to determine damages and the value of the separate interests is the one whereby we first determine the value of the feehold as if unencumbered by any lease. In so doing, we consider the feehold as if the owner were operating the business with its consequent value in the market place, as a going business. WTien this value shall have been established, then we look at the lease and determine first if the contract rent is the same as, or less than, the market value of the leasehold or economic rent, in which event the problem is simple. The lessee is out because his lease interest or contract rent is less than or only even with the economic rent, whereby it develops that he has no interest in the land greater than his obligation under the lease.
However, if we find that the market value or economic rent of his leasehold is greater than the contract rent, then the lessee has a valuable interest in the land generally referred to as “ Bonus Value ” which is represented by the difference in the rent he has to pay and the rent he could get in the market. This is a valuable interest in favor of the lessee.
It is the function of the court to apportion the damage according to the interests of the parties. However, we must be sure that the compensable damage payable to the separate interests is no larger than the damage to the property as a whole. (Matter of Daly, 29 App. Div. 286, 287, 288.)
This is the common acceptance of the principle of compensation where separate feehold and leasehold interests are involved; and, as far as the court can now determine, has been applied generally, as in the latest decision of the Appellate Division, *942 Third Department, in the case of Great Atlantic & Pacific Tea Co. v. State of New York (25 A D 2d 905).
However, common to all these decisions, we find that the land with its improvements and use has an already established personality or character, which characteristic has drawn the tenant and the tenant accepting that fact as the basis for his use accepts it except for the lease terms which remain subject to discussion and negotiations between the parties.
■ Do the facts in this ease justify the application of the above method to determine the several interests? The court doubts that this method would result, in a factual situation like the present, in fair compensation to either claimant.
Are we then to accept the theory upon which the respective claimants have based their proofs of separate evaluations of their interests, namely, that given the facts in this case, the separate interests are larger than the whole ?
'My answer is no. The court concedes that the Siegel group could sell their interests as owners to an investor; likewise could Arlen. However, it is basic that the State is not bound to make greater compensation for all the combined interests in the land taken than the full value of the fee. (Matter of Daly, supra.)
We must determine, therefore, the key issue presented by this trial. What makes the “combined interests ” here, the lease to Banner or the subleases to Korvette ? The court holds that only Korvette made the value of the land. Certainly, Banner had no interest in the land except that it had Korvette to work with and for. Korvette, which was a great discount store, had the means to pay the stipulated rents which produced for Banner an original mortgage commitment of $2,000,000, later expanded by the same insurance company to $3,900,000 (which on the basis of a 75% mortgage of the fee, which is normal in the market would indicate a “finished” value of about $5,200,000), thus permitting Banner to erect the “Built On ” parcel shopping center. Without Korvette, Banner would hardly have had any interest in the subject land, or the ‘ ‘ Built On ’ ’ land.
Siegel and his group knew that the Korvette tenancy was the only reason for the lease with Banner. This fact the Siegel group acknowledged in their lease.
What would a knowledgeable buyer consider more advantageous to himself if he desired to invest his money' — the Siegel interest or the Banner interest?
We think that he would first ask himself: Who is in possession here ? Who is the main rent payer in this enterprise ? Upon what lease or sublease terms?’ How much rent is paid alto *943 gether? How good is that subtenant to insure continuity of payment? Is the tenant or subtenant well rated? If the answers to these questions are positive, he would then consider what he would have to pay the owner by way of rent, and add to that the sum necessary for the maintenance and upkeep of the property, the mortgage amortization and interest, and arrive at the annual sum which he would have left for himself.
The proposed purchaser would then base his ultimate decision to purchase one or the other interest generally, if not solely, upon which of the interests was more favorable to him.
We must bear in mind that the owners had merely assembled the land which they hoped to turn into a shopping center, any type of shopping center with no prior ‘ big ’ ’ name business enterprise as the focal and attractive tenant. Not until Banner came along did the parties have Korvette as the main tenant. As soon as Korvette was available, Siegel ended his search for any other tenants. The “big” prize had come along and all negotiations were addressed to making effective Korvette’s desire to use Siegel’s land. Korvette was it. Korvette would make the character and personality of the subject property, for Korvette was AAA rated, and a “long time” tenant. If Korvette had said “no ”, Banner would have had no reason to enter into the lease and pay an average of $60,000 yearly rental.
On these facts the court determines that the value of the whole was made by the subleases to Korvette, rather than by the lease to Banner. We determine that the value of the subject, based upon the terms of the subleases to Korvette represents the maximum value of the whole property when such value shall have been determined. We shall evolve the value of the lessor’s interest predicated upon the lease between lessor and Banner and, in this manner, determine the value of the separate interests in the whole of the property.
We repeat that we reject the claimants’ assertion that the value of the separate interests may properly be found to be greater than the value of the whole. We contend that under no circumstances may we discard the principle that first we determine the value of the whole as a package and then apportion the several interests within the whole, whether such value be based upon the present approach adopted by the court or any other approach of value. Such principle of evaluation is the sine qua non of the maximum which may be allowed. The only deviation from this principle which we think is proper in this matter is only the approach we must use to determine the value of the whole and of the several interests.
*944 Accordingly, as a first step, we refer to the written appraisals as well as the testimony of the four appraisers. To understand their viewpoint, some reference must be made to their testimony.
Mr. Greco, an attorney and appraiser, testifying for the State, conceded that there were not available for comparison any sales of tracts of the size of subject property. He, therefore, examined a number of smaller sales which resulted in assemblages somewhat similar to the subject in size. These produced values of average unit cost per acre of $11,400, $8,100, and $2,100 for the last parcel which occurred in. 1954, but to which, he stated, he attached no. weight. Then he attempted to analyze the later sales (Sales 20, 22, 23) of the same land (1960, 1961) plus Sales 1 and 2 which were sales of the Squiteri parcel, three blocks west from subject and located on the north side of Route 59, which contained about the same frontage on Route 59 as the subject but had 56 acres of land. Sale 1, January 12, 1960, was $11,500 per acre. Sale 2 of same property occurred March 29, 1962, at $15,000 per acre. From these analyses, and making allowance for an increment due to the assemblage factor, he valued the subject land on the date of vesting at $15,000 per acre, or $400,000.
However, he took notice of the aforesaid leases and subleases and fully analyzed their terms, including the option to purchase, beginning with the 11th year and ending with the 25th year, as well as the fact that the Korvette subleases would become effective only upon certain specified buildings being erected by Banner for Korvette’s use. He confined his attention solely to the main lease from Siegel to Banner and determined that the contract rent was at least as much as the economic rental value of the leasehold and, therefore, found that Banner had no leasehold interest. He determined that according to his analysis of the rental paid on the ‘ ‘ Built On ’ ’ property, on the basis of the principle of substitution, a lessee would pay no more for the subject property than he would for the “ Built On ” site.
He capitalized the subject lease at the rate of 9% which, when applied to the yearly income of $61,250, resulted in a value of the subject land of $680,000, or $25,400 per acre. This is the before value he finally placed on the subject land. He stated that based upon the strength the subleases added to the main lease, he was justified in his final conclusions of value.
To further justify his conclusions as well as the juxtaposition of the rental capitalization on the “ Built On ” site to the subject land, Mr. Greco recognized that the parties to the subject land are experienced, astute investors who are fully acquainted *945 with the values of property in the area. Yet, he fully reverses his opinion when, on page 25 of his appraisal, he “ concluded that the lessee has no leasehold interest as a result of the sublease ” and then continues: “There are no buildings in existence. The question arises then, even after the buildings and improvements are completed, will there actually be a surplus? ” To his own question, Mr. G-reco answered “ NO! ”
To the court, the reasons he gave for this “ NO ” are specious and are intended only to justify an untenable stand he took with his eyes wide open. He asserts that it is a common occurrence that cost often exceeds estimates; that there may be strikes and delays on the job, while taxes, interest and rents run. For these imponderables, as he called them, he called three strikes on the lessee’s interest.
He chose to forget that Banner has built, on wholly-owned land or leased land, over 11 such shopping centers with Korvette as the pivotal tenant and some 32 for Spartan, a similar large enterprise, throughout the Middle West. Would they continue this chimera, may we ask, unless they made profit after paying the ground rent? Of course they would not, and the resultant favorable “Built On” enterprise next door to subject land is the best evidence, even though the ‘ ‘ Built On ’ ’ parcel is not as attractive and favorable as the subject.
One may well ask whether Banner would go through these complicated lease transactions, make surveys, make topographical maps, make plans for the buildings, proceed with the successful petition to change the zoning, apply for building permits, hire lawyers, make repeated trips with and without lawyers to the Department of Public Works at Poughkeepsie, lend large sums of money to the lessor at no interest to enable lessor to pay off the existing mortgage, apply for and procure a $2,000,000 mortgage commitment, deposit $90,000 with lessor, plus a variety of other things, unless they knew what they were doing? How could they be acknowledged to be so shrewd and knowledgeable on the one hand while, on the other, they would be so droll and naive as to do all this merely for love of the landlord? In operations of this kind it is well known that the preliminary expenses are very high. Many, many thousands of dollars, plus their own valuable time, were spent by Arlen and Siegel before these assemblages were finalized. These people do not spend these sums in chasing rainbows.
The court saw these people in the courtroom, heard them and concluded that they knew what they were doing which, as hereinafter indicated, justified the value of the interests found herein *946 for now plain, land had been transferred into land with the certain potential of producing very substantial returns for both claimants.
Mr. Greco applies a land interest rate or capitalization rate of 9%, The court finds no justification for this rate. The court at the proper time herein, will apply a 7% interest rate rather than the usual 6% interest rate applicable to land for the reason that there were certain vagaries involved herein, such as the right of the tenant to mortgage the entire property and to purchase it after the 10th year of the lease as well as other elements, such as ICorvette franchised operators, who operated under the Korvette name but were independent operators. Other subtenants, not yet known or defined, were to be accommodated, etc. These can be some source of trouble even though at the moment such trouble cannot be pinpointed. It may not arise at all, yet these are matters of concern on the date of appropriation for which reason we feel that a 7% rate is more justified than the 6% rate.
Following now on our theory of determining the highest and best value of the land and buildings based upon the sublease rather than the lease, we shall determine whether we accept the methods and results submitted by Mr. McCormick, the appraiser for Banner, who adopts the building costs as evaluated by Mr. Jacks, the building expert, and adds those to the land value.
We do agree with Mr. McCormick that the right given to the tenant by the lessor to mortgage the entire land and improvements is an asset to the tenant which lessens the value of the reversion. Also the right of Banner to buy the fee beginning the 11th year of the lease is also an asset to the tenant, for by then the mortgage will have been well reduced while'the rent income remains constant.
We might say here, however, that in spite of the lease agreement, the perpetuity which may be considered here will be limited to a maximum of 40 years which, in the opinion of the court, is the maximum useful life which may be conceded to the buildings contemplated, not so much because they would not be up and useful at that time, but more so because the discount business is like a kaleidoscope which is constantly moving and which requires new approaches, new attractions, new ways of presenting the wares held for sale, a new overhaul of the buildings or perhaps replacements during those years. During that period, a number of changes will have been made to meet competitive innovations. However, the *947 time will come when replacement and not changes will be required. This, we believe, will occur in 40 years.
For the remainder 60 years under the lease option the manner of reconstruction, costs of labor and material seem so indefinite and speculative as to furnish us no definite base of approach for which reason we disregard them.
We shall employ the Inwood method to determine the present value of the various interests referred to. This method is justified, we feel, because the property possesses an income stream which primarily has the characteristics of an annuity, for the leases all appear to be well secured. (The Appraisal of Real Estate [3d ed.], p. 306.) We thus take certain things as presented, and discount where necessary, according to the facts we present. As did Mr. McCormick, the court will accept, for example, Mr. Jacks’ detailed figures of the projected costs indicated for establishing “all” the contemplated buildings as if these represented one enterprise, the ‘ ‘ whole basket ’ ’ (Levin v. State of New York, 17 A D 2d 335, 337) for the reason that they were, convincing and were not effectively disputed; but after the final figures have been reached, will make a rearrangement against Arlen for items such as (1) “ Built On ” parcel required more fill than would be required on subject; (2) “Built On” encountered much more costly Winter weather work due to modifications of the original plans and the refiling of the plans; (3) the subbase on “ Built On ” parcel was found to be unsuitable for the parking lot, as a result of which the following year had to be practically rebuilt and the laying of the foundations was much more costly on the “Built On” site because a muddy subsurface made the foundations more expensive than it would have been on the subject land which was higher and more solid on the portion where the structures were to be built.
1. Using this approach we shall assume, therefore, that the subject property would be developed by a single owner and that the tenants and leases thereon would approximate those existing on the “ Built On ” property. We make this assumption to derive the optimum rental value of the whole enterprise thus:
1 Korvette $285,000
2 Korvette Addition 36,000
$321,000
3 Tire City $21,240
4 Klion 50,328
$71,568
*948 5(a) Kinney Buildings (10 year average) $35,606
(b) Vacant space (Rental value) 35,000
$70,606
Loss 10% vacancy allowance 7,060
Effective gross income $63,546
Expenses
(a) Beal estate taxes $9,500
(b) Insurance 750
(c) Repairs 750
(d) Management (3%) 2,000
- $13,000
Net from Kinney $50,546
Total estimated property net income $443,114
2. Since the buildings are ‘ ‘ new ’ ’ and their cost is known we adopt the land residual approach (The Appraisal of Real Estate [3d ed.], p. 312).
a. Building Costs (as per Mr. Jacks) $2,915,873
b. Plus taxes and interest during construction (Taxes $20,000 — Interest $90,000) 110,000
Total $3,025,873
c. Irrespective of the lease terms the court assumes a 40-year life for the buildings, as above explained, which would require an annual 2%% recapture rate which we add to a fair interest rate of 7% in order to determine the necessary building return which will be deducted from the whole net income, thus we find the whole building rate to be 9.5%.
3. a. We have already figured the total net rent from property to be $443,114
From this total we deduct the return and recapture of the building investment minus $3,025,873 x .095 (9.5).......... -287,458
This $155,656 represents the net income
residual to the land and leasehold..... $155,656
*949 b. Using a capitalization rate of 7%
— (for the reasons given above) we arrive at a value of the land of $2,220,000 (rounded)
Having thus established the net rental value of the land and leasehold we proceed now to appraise the separate interests:
1. We conclude that Siegel (feehold) has the strongest position since he will receive the first and most certain fruits of the property productivity; however, since he has granted the lessee the right to mortgage his property and to purchase at $31,000 per acre at the end of 10 years we' thus consider 7% a proper return for the fee since these privileges to the lessee lessen Siegel’s interest in the land, and
2., Since Arlen has the riskier as well as the secondary position made so by possible vacancies, fire, bankruptcies, depression, etc., which could occur in the unknown future, an 8% return is considered by the court to be appropriate to evaluate its present worth.
We proceed now to ascertain the
A. Value of fee — on the basis of a 10-year term, since Arlen had the right to purchase - at the end of 10 years, Siegel had the right to receive the established income ■ stream for 10 years, plus the stated price to purchase at $31,000 per acre at the end of 10 years as established in the lease:
1. Present worth of $30,000 per annum for
1 year at 7%: $30,000 x .935 = $28,050
2. Present worth of $61,250 per annum for 9 additional years at 7% : $61,250 x 6.089 (7.024 - .935) $372,951
3. Present worth of reversion: 26.783 acres at $31,000 per acre = $830,273 We take $830,273 x .509 (7% rate due in 10 years) (7.024 — 6.515) == $422,609
Total value of leased fee = $823,610
B. To figure the Arlen leasehold interest we take the total net rental value of $155,636 and deduct rent payable to Siegel of 61,250
We find the net rental to Arlen for ten years to be ................ $94,386
*950 Since we assume Arlen to be an intelligent investor we must assume that Arlen will exercise the. option' to purchase because it will enjoy the net rental of $Í55,636 beginning with the 11th year.
1. The present worth of the right to receive $94,386 per annum for 10 years at 8% is $94,386 x 6.71 ..................... $633,330
plus
2. The present worth of $155,636 per annum for the obligatory lease period remaining namely 15 years, deferred 10 years, at 9%, we use a factor of 3.40 (9.823 — 6.418) rounded, thus $155,636 x 3.40 ;.............................. $529,160
The present worth of 1 and 2 above....... $1,162,490
3. From the total of $1,162,490 we must deduct the cost of buying the property at $830,273 at the end of the 10-year lease period for which reason we defer cost for 10 years at a rate of 9% = thus $830,273 x .423 (6.418 - 5,995 =* 423)... $351,205
leaving a balance of $811,285
To which we now add:
4. The right to receive the entire net land income for an additional 15 years deferred 25 years, until' the end of the assumed economic life of the property, but at a 12% rate since we have no guarantee that Korvette would renew its lease after 25 years (8.24- — -7.84 = .4) : 155636 x .4 = 62,254
and
5. The present value of the land reversion at the end of 40 years $2,220,000 discounted at 9% thus $2,220,000 x .0318 (10.757 — 10.726 = .0318) = 70,596
Total value of the leasehold interest is $944,135
This total we reduce to $875,000 for the reasons heretofore given.
*951 We summarize now the. respective values of the feehold and leasehold at the time of the appropriation;
Claimant Siegel et al.................... $823,610
Claimant Arlen ......................... $875,000
We have developed a land value of $2,200,000 and a building value of $3,025,000
$5,225,000
which based upon a rent as on “Built On” property of $443,114 represents an over-all rate of 8.25+%.
The lessors’ appraisal sets forth a land value before the appropriation of $859,000, a value after of $90,300, a damage of $768,700, of which $272,300 was consequential.
The State’s land appraisal sets forth a value before the appropriation of $680,000, a value after of $128,000 and a damage of $552,000 of which consequential to the remaining larger parcel only is $145,000.
The court finds that the fair market value of Siegel’s land before the appropriation was $823,610. That the value after the appropriation was $121,000, allocated to Smith Street 1,4 acres at $20,000 per acre = $28,000, and Rose Street parcel 9.37 acres at $10,000 an acre $93,000 (rounded). The court finds that the damage sustained by the claimant Siegel was $702,610, of which $25,000 (rounded) is consequential to Smith Street parcel, and $207,000 (rounded) is consequential to Rose Street parcel, or total consequential damages of $232,000.
The claimants, Bernard S, Siegel et al, are entitled to an award against the State in the sum of $702,610 for all damages direct and consequential, with interest thereon from May 10, 1961 to November 10, 1961, and from February 7, 1962 to the date of entry of judgment herein.
The claimant, Arlen of Nanuet, Inc., is awarded the sum of $875,000 for all damages direct and consequential, with interest thereon from May 10, 1961 to November 10, 1961, and from December 22, 1961 to the date of entry of judgment herein.
It may be noted here that the claimants presented very experienced realty appraisers. However, not in criticism of them but as a notice to all appraisers, we say that' they, too, were of much, less help to the court than their ability would warrant for the reason that they limited their presentation too much on mere showing of the figures they used, factors they employed and results achieved. These as the court later studied them are of too little help. The court, who is not an appraiser, considers this type of presentation adequate for *952 a group of professional appraisers, but not adequate for nor very helpful to the court. ■ Each step appraisers take in developing their appraisal should have with it a complete explanation and the reason for the approach used, regarding the rate, value, etc. They know their profession and hence it must be their concern to be of the maximum aid to the court and litigants by competent presentation not only of the figures but of the facts which have induced them to use the approach adopted in the appraisal. It is not enough that if properly questioned at the trial they will give such adequate reasonings and explanations for the record. Those should he in the written appraisal and with each value approach they present.
As a result of this comprehensive and yet sketchy presentation by the appraisers, this court, desirous of awarding the just value each claimant had, has had to spend nights and nights reading books, tracts and treatises on this particular subject in order to choose what it considers the proper rates, etc. to be applied herein, and has had to just about reconstruct the appraisal for each of the claimants. A case as complicated and difficult as this one deserves not a month to try but more informative appraisals to help the Judge hold the trial to a minimum of time.