(120 App. Div. 700)

## In re DELANCEY STREET IN CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department. July 15, 1907.)

EMINENT DOMAIN—LEASEHOLD INTERESTS—METHOD OF ASSESSING DAMAGES—ASCERTAINMENT OF VALUES.

Where land subject to a lease is taken under the right of eminent domain, the proper method of estimating damages is to ascertain what interest the tenant has in the lease as a whole, considering the rent he pays, the obligations that he has and will assume under the lease, and what that interest is worth and its market value, and after this amount is ascertained, awarded the tenant, and deducted from the total value of the property, the balance belongs to the landlord.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 18, Eminent Domain, § 421.]

Appeal from Special Term, New York County.

In the matter of the application of the city of New York to acquire title for lands required for the opening of Delancey street. From an order confirming the report of commissioners of estimate and assessment, awarding to a tenant a portion of the award made for the property, Lucius H. Beers and another, as executors of the last will of Robert R. Stuyvesant, deceased, appeal. Reversed.

Argued before McLAUGHLIN, INGRAHAM, LAUGHLIN, CLARKE, and SCOTT, JJ.

Henry De Forest Baldwin, for appellants.

Frank O'Connor, for respondent.

INGRAHAM, J. The property which has occasioned this controversy is located upon Chrystie street, in the city of New York. It had a frontage of 68 feet 9 inches on Chrystie street, upon which there had been erected a building or buildings, and of this 68 feet 9 inches the northerly 52 feet were taken in this proceeding, leaving the owner 16 feet 9 inches. The owner of this property also owned a lot fronting on Delancey street which was included in the property taken, and the commissioners awarded for No. 13 Delancey street and Nos. 145 and 147 Chrystie street, together, to the owner the sum of $49,500, and to the lessee of this property the sum of $86,000, which was divided as an award for the buildings of $71,000 and for what was called the "leasehold" $15,000. To that report the owners filed their objections: That the award made to the lessee on account of the unexpired term of the leases held by him on properties Nos. 145 and 147 Chrystie street, included in damage parcel No. 85, was greatly in excess of the fair market value of the unexpired term of said leases; second, that the award made to the owners for the land included in the parcel designated "Damage Parcel No. 85" is inadequate and much less than the fair interest of the owners in the premises taken at the time of the vesting of title in the city of New York, and not due compensation for damages sustained by said taking; and, third, that the commissioners adopted an erroneous method of estimating the value of the leasehold and the amount of the award for said leasehold to be paid to the lessee. The property vested in the city of New York in pursuance of a resolution of the board of estimate and apportionment on the 28th day of July, 1903. These objections were overruled by the Special Term, and the report confirmed, and there is presented on this appeal the question as to the correct method of ascertaining the interest of a lessee of real property taken under the right of eminent domain.

The property in question was, at the time the title vested in the city, owned by one Robert R. Stuyvesant, who had on the 5th day of July, 1899, leased it to Adolph Schlesinger by three leases for 21 years, with covenants for two renewals of 21 years each. These leases were identical in form, and the rent reserved for the term was $1,650 a year; the tenant to pay all taxes, assessments, and other charges. There is no question raised as to the value fixed by the commissioners upon the property as a whole, but the owners object to the award made for the value of the leasehold of $15,000 in addition to the award made to the lessee

for the value of the buildings erected upon the property. In this discussion, therefore, we may assume that the total value of the land and the buildings was properly fixed by the commissioners. The commissioners awarded the landlord $49,500, but this included his interest in the Delancey street property. It would appear from the award and the testimony that the commissioners fixed the value of the fee of the land of the Chrystie street property at $42,500, and of this amount awarded the tenant $15,000 and the owner $27,500. This would make the total value of the Chrystie street property as fixed by the commissioners $113,500, of which the tenant was awarded $86,000, and the owner of the fee $27,500.

Before the commissioners the owners conceded that the tenant was entitled to whatever award should be made for the buildings, and the question as between the landlord and tenant seems to have been confined to the amount that should be awarded to the lessee, in addition to what was considered to be the value of the buildings, as the value of the leases. Upon this question experts were examined by both the landlord and tenant, and they attempted to fix the value of the lessee's interest in the property upon calculations as to the amount of rent paid to the owners and to the amount of rent which the tenant was able to collect from his subtenants ; and the different theories upon which these experts based their judgment is shown by the remarkable conclusions at which they arrived. The expert for the tenant estimated the unexpired term of the leasehold interest on the day the title vested in the city at $130,662.03, being some $17,000 more than the total value of the property as found by the commissioners for buildings, lessee's interest, and lessor's interest. So far as I understand, the accuracy of his mathematical computation is not disputed, and, if the value of the leasehold could be correctly estimated by such a method, I do not see that the owner has suffered any damage, and yet he was in receipt of a net rental of $1,650, with the probability of a considerable increase when the lease came to be renewed. It is only fair to say, however, that this witness estimated the entire property as worth $141,646, so that in his opinion the value of the fee of the property subject to the lease was about $11,000. The expert called for the lessors testified that the market value of these leases, if offered for sale, would be about $3,500. This element of market value did not seem to include any interest in the buildings upon the property, as the parties had by their apparent acquiescence agreed that an award for the buildings should be made to the tenant.

But, in the view I take of the proper method by which the value of a lessee's interest in real property is to be ascertained, it seems to me that it is impossible to eliminate the value of the buildings upon the property and treat the lease as a lease of unimproved property. In considering the method to be adopted in ascertaining the value of the interest of a tenant of real property for a term of years, we must first obtain a clear idea of the situation: Stuyvesant was the owner of a plot of land, and as such owner he was entitled to the use of the property, and it could not be taken from him except for public use, and then only upon paying him its full value. In 1899 he leased that prop-

erty to one Schlessinger for 21 years, with a covenant for two renewals of 21 years each. Certain rent was reserved, the tenant to pay all taxes, assessments, and other charges, and to erect a building or buildings upon the premises. At the end of the 21 years the landlord was to have the privilege of purchasing the buildings at an appraised value or granting a new lease at a rental to be based upon 5 per cent. of the value of the property as unimproved property. At the end of this first period of renewal, the landlord had a similar option, either to purchase the building or to grant a new lease; and at the expiration of the second renewal all improvements upon the property were to belong to the landlord. In 1903, about 4 years after the execution of this lease, the city of New York took the property, and was therefore to pay to whoever owned it its fair value at that time. That value was to be ascertained, not by an examination of the profits of the business carried on in the buildings or the use to which the buildings could be put, or the value of the buildings to the owner as a business site, but the fair market value thereof, the price for which the property could be sold, and as against both the owners of the property and the tenant that selling price or actual market value is fixed as the amount that the city is required to pay, and it stood in place of the property. Now, it is clear that both the owners and the tenant had an interest in the property; their total interest being represented by the amount that had been ascertained as the actual value of the whole property. The owner of the fee owned the property, and had granted an estate for years to the tenant.

When the question of distributing this award as between the tenant and the owners of the fee arose, it is apparent that the first question was to ascertain what was the value of the tenant's interest in the property; for that, having been granted by the landlord or owner of the fee, was to first come out of the amount to be paid for the property as a whole. It seems to me perfectly clear, however, that the only correct method of ascertaining the value of the tenant's interest was to proceed upon the same basis as in ascertaining the value of the whole property, and that is to ascertain just what the market value of the leasehold interest was at the time the property was taken. To ascertain that it was necessary to apply the same rules as had been applied in ascertaining the market value of the property as a whole. The buildings that had been erected upon the property had become a part of the freehold, and could no longer be treated as a separate identity apart from the freehold, and both the landlord and tenant had an interest in them, as well as in the land itself. The tenant's interest was not an interest in the ownership of the buildings detached from the land, but an interest in the real property, which consisted of the land and buildings; and it was therefore the duty of the commissioners to ascertain what was the market value of this interest of the lessee, not based upon the value of the buildings, or what the lessee was able to make out of the buildings, but an inquiry simply as to what it was worth in the market as a piece of property. The fact that to ascertain such a value involved more or less difficulty is no reason why it should not be fairly met and determined. What was taken by the city was this property. In it the lessee had an interest. That interest the city must pay for, and that

interest must be ascertained by the same methods used in ascertaining the value of the property taken as a whole.

It is quite evident that the commissioners, largely, I think, as the result of the attitude taken by counsel for both the landlord and the tenant, applied an entirely wrong principle in determining this question. They considered that the buildings, as distinct from the real property, belong to the tenant, and then proceeded upon some theory which is certainly not based upon any evidence before them to fix, in addition to the value of the buildings, some value in the lease as a lease without the buildings. Whatever may be said of the difficulty of ascertaining just what the tenant's interest in this property as a whole was, it certainly was much less difficult than to ascertain what was the value of a lease of this property as distinct from the occupation and ownership of it as it was occupied. But it seems to me perfectly clear that the only method which will do justice is to ascertain just what interest the tenant had in the lease as a whole, considering the rent he pays, the obligations that he has and will assume under his lease, and just what that interest is worth and what is its market value, and, that having been ascertained, award that amount to him as the value of the property taken, the remainder, of course, to go to the landlord.

An examination of the authorities show that this is the rule that has been uniformly adopted when this question has come before the courts. The proper method of ascertaining the value of a lease was presented to this court in People ex rel. D. & H. Co. v. Feitner, 61 App. Div. 129, 70 N. Y. Supp. 500, affirmed on opinion below 171 N. Y. 641, 63 N. E. 786. What the court had to do in that case, as is necessary to be done in this, was to ascertain the value of a lease of real property, and it was held that the interest of the lessee in the property was the actual value of the leases, and that this had no relation to the value of the property leased. In Clarkson v. Skidmore, 46 N. Y. 297, the question presented was as to the apportionment of certain surplus moneys realized from the sale of mortgaged premises which were subject to a lien. Discussing the question as to the value to be awarded to the lessee the court said:

"The lessee, as between himself and his lessor, had a right to the possession and enjoyment of the whole of the premises during the residue of the term of his lease, being six years, subject only to the payment of the rent reserved in the lease and of the annual taxes, which he had agreed to pay. * * * To the extent of the value of the rights thus vested in the lessee, the lessor had, by giving the lease, diminished the value of his own estate. * * * If the rent reserved in the lease was equal to, or more, than the annual value of the premises, then the estate of the lessee was manifestly worthless; but if, on the contrary, as appears to have been the fact, the annual value of the property was much greater than the rent reserved in the lease, the estate of the lessee was of importance, and a serious incumbrance on that of the lessor; and the lessee is entitled to receive its equivalent out of the surplus of the proceeds. * * * The value of the term must depend upon the circumstances of every individual case, the length of the term and conditions of the lease, the character of the property, its location, the readiness with which it may be let, the condition of the buildings, whether substantial and durable, or requiring frequent repairs, the uniformity of rents in the neighborhood, or their fluctuating character—in short, every material consideration which would enter into the mind of a purchaser of the term,

in judging what would be a fair price for it, and, like other ordinary questions of value, should be determined, as a matter of fact, upon the testimony of witnesses competent to speak upon the subject."

In that·case, as in this, the lessee had made valuable improvements upon the premises after the commencement of his term. There was no suggestion, however, that he was entitled to be repaid the value of the buildings that he had erected upon the demised premises, but it was the value of the estate of the lessee secured to him by the lease to which he was entitled. And Clarkson v. Skidmore, supra, was followed in Larkin v. Misland, 100 N. Y. 212, 3 N. E. 79, where it was held that the lessee was not entitled to share in the surplus moneys realized from the sale of the leasehold premises, in the absence of evidence that the value of the leasehold estate was in excess of the rent reserved. The court said:

"In the absence of proof to the contrary, the rents reserved must be presumed to be the fair annual value of the use of the land."

And this same. rule has been applied, without exception so far as I can ascertain, where property subject to a lease has been taken under the right of eminent domain. In the Matter of William and Anthony Streets, 19 Wend. (N. Y.) 678, the property to be taken was subject to a lease with two covenants for renewal. It was there held that a lessee was entitled to be paid the value of his lease, and in discussing the question the court said:

"For the purpose of illustration, we will take a case in which the whole of the property is required for the contemplated improvement. If the ownership of the property is divided between a landlord and his tenant, each may sustain a part of the loss, and will be entitled to a portion of the compensation and recompence. If the rent reserved is equal to the full annual value of the property, and there is nothing else to affect the question, the landlord will be entitled to all the damages. The tenant loses nothing, and is, consequently, entitled to nothing, or, at most, only to a nominal sum. But, if the rent is less than the annual value, the tenant sustains a portion of the loss. * * * The value of the term, whether long or short, may be affected by other stipulations in the contract than those directly relating to the rent. If, for example, the tenant is to pay taxes, the amount of that burden constitutes a part of the price which he pays for the enjoyment of the property. So, if the tenant agree to make erections or. other improvements on the land which will endure beyond the term, the value of his interest in the property is plainly· diminished, and that of the landlord increased, by the covenant."

And the same principle was expressly recognized in Matter of West Shore R. R. Co., 35 Hun, 633, where the rule is stated:

"The lessees are entitled to receive as their damages the value of their term, and the balance belongs to the remaindermen."

See, also, Matter of Central Park, 54 How. Prac. 313.

I have not been able to find any case in which this principle has been departed from, and I think it should be applied in all cases where property subject to a lease is taken under the right of eminent domain. The commissioners, having first ascertained the value of the property as a whole, are then required to apportion the amount thus determined among the several parties who are interested in the property. Where the property thus taken is held under a lease, the value to the lessee of his estate in the property is to be determined, and that value is to

be ascertained upon the same principles that are applied in ascertaining the value of the property as a whole. What is to be ascertained is the fair market value of the lease. Undoubtedly all the elements of a lease can be considered, and in addition the testimony of experts, who are to testify as to the market value of the lease, with the covenants, conditions, and obligations imposed upon the landlord and the tenant, and it is this market value to which he is entitled.

As the commissioners manifestly proceeded upon a wrong theory in determining these damages, I think the order appealed from must be reversed, with $10 costs and disbursements to the appellant, and the report sent back to the commissioners to determine the value of the lessee in this lease as a whole, in accordance with the principles above indicated. All concur.