Feed A. Young, J.
On August 19,1958 the State of New York for highway purposes, pursuant to Highway Law (art. XII-B), appropriated in fee 0.273 acres, as well as a temporary easement consisting of 0.163± acres, from the lands owned by claimants Michael Eossi, Dominick Eossi, Alphonso Eossi, George Eossi and William Eossi, located in the City of Eome, New York, by filing East Whitesboro Street Arterial Maps No. 38 and 55, Parcels 42 and 60, with a description of such property, in the County Clerk’s office, Oneida County.
The court adopts the map and description of the appropriated property shown and set forth on such map and reference is made thereto for such description without repetition thereof.
The claim of Michael Eossi, Dominick Eossi, Alphonso Eossi, George Eossi and William Eossi was filed in the office of the Clerk of the Court of Claims on March 5, 1959 and served upon the Attorney-General on October 8, 1959. The claim of the Great Atlantic & Pacific Tea Company for the value of a leasehold in the premises appropriated and for the value of fixtures located therein, was filed in the office of the Clerk of the Court of Claims on August 31, 1959 and served upon the Attorney-General on September 1,1959.
The claims have not been assigned.
The appropriated parcel, approximately 11,092 square feet in area, was part of a large odd-shaped tract comprising some 46,553 square feet, fronting 181 feet on Black Eiver Boulevard, 89.79 feet on Bouck Street, and 85 feet on Whitesboro Street, in the City of Eome, New York.
At the time of the appropriation the subject property was improved by a modern one-story concrete building with a brick front and built-up roof, approximately 14,672 square feet in area with a basement 1,062 square feet in extent. This structure, which was located within the appropriated area, was constructed in 1942 for use as a supermarket, and, at the time of the appropriation, was leased to the claimant, Great Atlantic & Pacific Tea Company, hereinafter referred to as the A & P.
Certain requests to find submitted by the claimants, which we have adopted, contain a detailed description of this structure so that further description herein would be repetitious. We find it only necessary to note that the building was maintained in good physical condition and suffered no functional or economical depreciation up to and including August 19, 1958.
Approximately 17,800 square feet of the Eossis ’ premises was improved as a blacktopped paved parking area. In addition thereto a corporation controlled by these claimants had leased an additional 13,500 square feet from the New York Central *207 Railroad to provide additional parking facilities for the A & P. The corporation was dissolved in 1957.
A 300-foot railroad siding was also located on the premises, as well as a 400-foot steel pipe fence along the New York Central right of way.
At the time of the appropriation the claimants’ premises was leased to the A & P at a rental of $1,295 per month; termination date was January 31,1960. However, the lessee had the further right to renew the said lease for a term of three years at a rental of $1,395 per month.
The A & P further paid the claimants an additional $40 per month rent for the use of the afore-mentioned 13,500 square feet of land for parking area, leased to the Rossis by the New York Central Railroad Company. We have not considered this leased area.
The real estate experts called by the parties are in agreement that the best available use for the subject property, at the time of the appropriation, was as a supermarket. It was favorably located for such a business enterprise, and adequate parking space, so necessary for such operation, was available. However, the defendants’ expert separated the parking area from the improved area in making his appraisal. The experts were also in agreement that after the appropriation the remaining property was suitable only as parking space for an adjacent bowling alley, and that the construction of the arterial route impaired the access to the property to such an extent that any other use of the property was not feasible.
Despite their agreement on the best available use of the subject property before and after the appropriation, the experts who testified on behalf of the Rossis and the State of New York differed greatly in their appraisal of the damage sustained by these claimants as a result of the appropriation of their property. This latter difference is more noteworthy since all of the experts used practically the same methods in appraising the property and in verifying such appraisal. Both parties submitted lists of real estate transactions in the vicinity of the subject property, which they considered comparable. However, the comparability claimed was only for land value; neither party could produce any comparable sale of a supermarket in the area. Both the Rossis and the State called builders who testified to the reproduction cost of the building.
The engineer who designed and supervised the construction of the building, testifying for the Rossi claimants, stated in his opinion the reproduction cost of the structure as of the date of the appropriation would be $13 per square foot for the first *208 floor, $8.49 per square foot for the basement. This figure included 7,300 square feet of blacktop placed in 1942, but did not include the railroad siding of the additional 10,000 square feet of blacktop placed in 1950.
The building expert testifying for the defendant never saw the building but merely studied plans. This gentleman valued the structure at $10,526 per square foot and the basement at $7 per square foot. This witness, who did not include the parking lot paving or the railroad siding, arrived at his appraisal by taking the original cost and adding thereto his opinion of the increase in such costs since 1942.
The real estate experts also gave their opinions of the reproduction cost.
The first expert for the claimants testified to a replacement cost of $14 per square foot, including all the blacktop and fencing. This witness did not examine the structure before it was demolished. His personal knowledge was based upon occasional visits to the store when it was in operation. Moreover he did not assign a value to the basement area. To arrive at the market value of the building this expert depreciated the reproduction cost by 20%.
The other two experts called by the Bossi claimants had actually examined the building to make their appraisal. Both allowed a reproduction cost of $12 per square foot. Only one of them allowed an additional $6 per square foot for the basement area. These experts allowed a depreciation of 10% and 20% respectively.
The State’s real estate expert gave a figure of $10.50 per square foot and also disregarded the basement. He also depreciated the value of the building by 40%. This high depreciation factor is not supported by the record and represents the bald opinion of this expert.
As we have indicated {supra), the experts in making their appraisals gave their opinions of the value of the land in addition to their valuations of the buildings. Two of the claimants ’ experts placed a value of $4 per square foot upon all of the subject land prior to the appropriation. The third stated that $3.91 per square foot was, in his opinion, the fair market value of the land.
The real estate appraiser called by the State appraised that part of the subject property devoted to parking at 50 cents per square foot and the area upon which the building was located at $1.75 per square foot.
All of these experts placed considerable reliance upon the lists of so-called comparable sales. However, we find none of *209 these sales were truly comparable in all respects. We note that all of the properties listed by the State were considerably smaller in area than that of the claimants and none were suitable for the construction of a supermarket. Moreover these com-parables, if so considered, indicate a value in excess of the 50 cents per square foot value assigned to the parking area by the defendant’s expert. Three of the properties on the defendant’s comparable list were improved by buildings which were hardly comparable. Moreover this expert claimed that he ascertained the land value by using the assessment ratio employed in the City of Rome to ascertain separate land value. There is considerable evidence in the record which places the assessments in the City of Rome in a rather questionable light.
In view of the difference in size, location and best available use, we have not given much consideration to the State’s list of comparable sales. The list submitted by the Rossi claimants, as is to be expected, contained sales showing generally higher prices than those submitted by the State. Only three of these were vacant land, the others had buildings on them, some properties were too small, others were located within the 100% zone, some were further from the center of town than the subject property. The grade of another was low. Another had a fire-damaged hotel building on it, which was later removed after the sale.
We cannot say that any of these sales were truly comparable, but we have considered them only as bearing generally on property values in the City of Rome.
Certain of the appraisers capitalized the rental income from the property to support their appraisals. Those appearing in behalf of the claimants used what they considered the actual rental value of the leasehold rather than the contract rent.
The State’s appraiser used the contract rent, which was admittedly lower than the fair rental value of the leasehold.
As we have indicated, the State’s expert placed too high a depreciation factor upon the building despite the excellent physical condition and lack of economic and functional obsolescence. He was unable to justify the 50-cent-per-foot figure he placed upon the parking area. He, moreover admitted that a parking area was both advantageous and necessary to the operation of the supermarket. In making his appraisal this witness also disregarded the fact that the A & P grossed $2,300,000 in 1957 and had showed increase gross sales with each successive year — a fact which speaks well for the suitability of the location for a supermarket. Moreover, the knowledge of this witness with respect to the rents paid by super *210 markets in Borne was not too accurate. Further analysis of his testimony indicates that, in making his appraisal, this witness appraised only the remaining fee without adding thereto the value of the leasehold. Use of the contract rent instead of the economic rent when employing the income approach method of appraisal results, in this claim, in an appraisal only of the Bossi interest therein rather than the fair market value of the entire fee. With all of these factors in mind we have considered the testimony of this witness accordingly.
On the other hand we find that the testimony of the claimants ’ experts was more realistic, although the list of comparables, upon which they relied to some extent, was not truly comparable. However, we find they made a better assessment of the various factors affecting the value of the subject property, such as the suitability of the location for a supermarket, which was reflected by the annual increase in gross sales, the adquate parking facilities, the excellent physical condition of the structure, the lack of functional or economic depreciation, and the availability of similar property in downtown Borne — factors which we find had an important bearing on the fair market value of the instant property.
In making our award, we gave considerable consideration to the reproduction costs given by the man who designed the building and supervised its construction. He knew best what was in it and how it was built. With respect to depreciation of the structure, land value, and over-all market value of the premises, we have given greater consideration to the claimants ’ witnesses for the reasons we have indicated {supra). We find that the fair market value of the subject property before the appropriation was $331,500, that the fair market value of the subject property after the appropriation was $10,000. The claimants have been damaged in the sum of $321,500.
In arriving at the value of the subject property after the appropriation we have considered the difficulty of access and the fact that there is only one potential use for the land remaining and that is as a parking lot for the adjacent bowling alley. Moreover there is little evidence to indicate that the bowling alley presently needs more parking area.
We now proceed to consideration of the claim of the A & P to which we have already referred. The A & P had a lease on the premises at a monthly rental of $1,295, which would expire on January 31, 1960. Such lease contained an optional renewal provision for a three-year period at a monthly rental of $1,395, expiring January 31, 1963. There is no doubt that this option would have been exercised but for the appropriation. It is *211 uncontroverted that the premises had an economic rent in excess of the contract rent. We find this economic rent to be $2,400 per month. We do not consider the rental from the 13,500 square feet of parking area, since such area was appurtenant to the leased land from the railroad. The A & P vacated the premises November 30, 1958 having paid its rent until that date.
We find that the market value of the claimant, Great Atlantic & Pacific Tea Company’s lease, at the time of the appropriation, was $37,570. The lessee is entitled to an award for the market value of the unexpired time of its lease, at the time of the appropriation (Matter of City of New York [Washington St.], 272 App. Div. 826; Matter of City of New York [Delancey St.], 120 App. Div. 700; Matter of City of New York [Seventh Ave.], 196 App. Div. 451). The owner of the fee is entitled to the full amount of the award for the land and improvements less the value of the remaining leasehold estate (Matter of City of New York [Washington St.], supra; Matter of City of New York [Delancey St.], supra).
The claimant A & P also seeks damages for alleged fixtures located upon the appropriated premises. Such damages sought are detailed on certain schedules entitled as follows: Schedule A — Installation costs on appropriated equipment. Schedule B — Installation costs on equipment relocated to another location. Schedule C — Installation costs on equipment sold. Schedule D — Pair market value of equipment at the time of appropriation. Schedule E— Market value of trade fixtures at time of the appropriation. Schedule P — Loss sustained on equipment sold.
The items enumerated in schedules A, B and C are improper. They are estimates of the 1958 cost of installing certain equipment installed on the property prior to the appropriation, rather than the market value of such equipment. Furthermore all of these items were removed from the premises by the claimant, A & P. Presumably they would have been removed at the end of the claimants’ term. We cannot allow damages for enforced, premature removal of property excluded from the taking (Matter of City of New York [Allen St.], 256 N. Y. 236; United States v. General Motors Corp., 323 U. S. 373).
The equipment listed on schedule D was removed and junked by the claimant because it had no location for such equipment. Moreover the items enumerated are personal property. There is no proof that removal resulted in damage to such items or to the property, nor that they were affixed to the real property so as to become fixtures.
*212 The items on schedule E are described as trade fixtures. We are not informed of their condition. Some are obviously personal property. Some may have been affixed to the realty so as to become fixtures but, again, we have no proof (Matter of City of New York [Whitlock Ave.], 278 N. Y. 276; Jackson v. State of New York, 213 N. Y. 34). Claimants urge these items have a market value as a going concern, and that we can make an award for their fair market value on such basis (Glen & Mohawk Milk Assn. v. State of New York, 207 Misc. 1130, affd. 2 A D 2d 95). However, there is no proof that these items enhanced the value of the real property.
The items on schedule F are obviously personal property, which the claimant A & P removed and sold for less than its book value for such items. These items of equipment were not fixtures or part of the realty appropriated for which an award may be made. They were clearly personal property and the A & P treated them as such (Matter of City of New York [Triborough Bridge], 159 Misc. 617, 633, affd. 257 App. Div. 940).
In view of the foregoing we make no allowance for the claim of the A & P for damages sustained as to fixtures as a result of the appropriation of the leasehold by the State of New York. Since we have disallowed the claim of the A & P for fixtures, the motion of the State to strike out certain testimony as to the value of the equipment, upon which we reserved decision, now becomes academic.
We find that the claimants Michael Rossi, Dominick Rossi, Alphonso Rossi, George Rossi and William Rossi are entitled to an award against the State of New York in the sum of $283,930 with interest thereon from August 19,1958 to February 19,1959 and from March 5,1959 to the date of entry of judgment herein. That the claimant, Great Atlantic & Pacific Tea Company, is entitled to an award against the State of New York in the sum of $37,570 with interest thereon from August 19, 1958 to February 19, 1959 and from August 31, 1959 to the date of entry of judgment herein.