26 N.Y.2d 346 (1970)
Arlen of Nanuet, Inc., Respondent-Appellant, et al., Claimants,
v.
State of New York, Appellant-Respondent. (Claim No. 39972.)
Bernard S. Siegel et al., Respondents,
v.
State of New York, Appellant. (Claim No. 40099.)
Court of Appeals of the State of New York.
Argued December 5, 1969.
Decided April 16, 1970.
Louis J. Lefkowitz, Attorney-General (Julius L. Sackman and Ruth Kessler Toch of counsel), for appellant-respondent.
Bernard L. Bermant and Carl J. Moskowitz for respondent-appellant.
David Marcus, Graham Barkham and William S. Gray for respondents.
Judges BURKE, SCILEPPI and BERGAN concur with Chief Judge FULD; Judge BREITEL dissents in part and votes to affirm as to the fee owners and to reverse as to the tenant in a separate opinion in which Judge JASEN concurs; Judge GIBSON taking no part.
*351 Chief Judge FULD.
The principal question posed  an important one in the field of condemnation  is whether it is permissible to fix the market value of land, completely bare when condemned, solely on the basis of capitalization of income expected to be realized from buildings and other extensive improvements not yet financed, on which no work had even been begun on the day of taking.
The State on May 10, 1961, appropriated slightly over 16 acres of vacant land  part of a larger 26.78-acre parcel  for highway purposes. The property fronted on a main highway in Rockland County and was well situated for development as a shopping center. The claimant fee owners (Siegel et al.) had completed their assemblage of the entire 26-acre parcel several months before the condemnation at a cost of $247,800 and had leased it to the claimant tenant (Banner Holding Corp., the assignor of Arlen of Nanuet) only four months before the taking for an annual rent, after the first year, of $61,250, for a 25-year term, with options in the tenant to renew or purchase. This ground lease expressly envisaged that the tenant would sublet the parcel to E. J. Korvette, Inc., a discount department store chain. Subleases were thereafter executed which obligated the tenant to erect, at its own expense, a large retail store building, a supermarket building, a patio shop and a parking area. Upon completion of this construction  an enterprise involving the investment of several million dollars by the ground tenant  the obligation of the subtenant, Korvette, was to become effective. *352 It was to pay an annual rent of $285,000 to its sublessor, the tenant Banner. Although these leases had all been entered into before the condemnation, not a shovel had been turned, no work whatsoever done, on the site. In a word, the plot consisted of vacant, raw land.
For the 16 acres taken by the State, the Court of Claims awarded $702,610 to the fee owners and $875,000 to the tenant (50 Misc 2d 934). A divided Appellate Division affirmed the award (of $702,610) to the fee owners but modified the tenant's award by reducing it to $525,000 (31 A D 2d 221).[1] In determining the value of the land, the courts below adopted a capitalization of income method  that is, they capitalized the rent expected to be realized from the buildings to be constructed on the parcel  and this, as indicated above, gives rise to the question with which we are primarily concerned.
The question is not a new one. (See Levin v. State of New York, 13 N Y 2d 87; see, also, Salzberg v. State of New York, 24 A D 2d 664, 665, affd. 18 N Y 2d 965; Levitin v. State of New York, 12 A D 2d 6, mot. for rearg. den. 13 A D 2d 611.) Indeed, in Levin v. State of New York (13 N Y 2d 87, supra), we dealt with the problem of valuing vacant land which, on the day of taking, had been leased to financially responsible people for development. In the Levin case, the State argued that the Court of Claims had fallen into the error of basing its valuation of the vacant land there involved on a capitalization of income from the land as if it had been improved by buildings which were not constructed at the time title vested in the State. We agreed with the State's position that such a method was impermissible but decided that the record did not support such a hypothesis. More specifically, although we held that executory leases and agreements  relating to land vacant on the day of the taking  may be given some weight as enhancing the value of the vacant parcels, we pointedly declared that it would be error to expand the weight of such evidence by treating those leases and contracts as if they represented an income flow already in being.
*353 Addressing itself to the State's claim of error, we wrote that the trial court "did not fall into [that] error of valuing the property by capitalizing the net rental income as might have been proper if the building had been completed and rent had commenced" (13 N Y 2d, at p. 91).[2] As I have already indicated, to give the anticipated rentals an annuity-like significance, as the courts below have done, is a distortion of the realities of the situation, of the condition of the property still vacant and unimproved. As we observed in the Levin case, one cannot "expect the prospective purchaser to pay for the vacant land in suit an amount equal to the worth of the conjectured net rental income * * * for, then, he would be paying an amount which would preclude any profit" (13 N Y 2d, at p. 91). We might have added, what is implicit in the opinion, that, if one paid before construction an amount equal to the value of the conjectured net income, he would not only have been precluding any possibility of profit but, indeed, might be letting himself in for a loss if the conjectured net income did not later materialize. Moreover, we went on to say, an experienced prospective purchaser, in determining the price he would be willing to pay, would be most directly concerned with "what other properties were selling for" and with what other "competitive alternatives"  fees or leaseholds  "were available" to him (13 N Y 2d, at p. 91).
These settled principles and guidelines, the indicia of value most frequently relied upon by businessmen as well as courts, are not to be deemed irrelevant merely because the vacant land appropriated was leased to a developer. However, both the Court of Claims and the Appellate Division were of the opinion that they could properly disregard such settled principles and the accepted indicia of value and, instead, rely on a capitalization *354 of rents from structures not yet begun to be built because they believed that there were special circumstances present.
With this in mind, let us consider the circumstances. In April of 1961, about a month before the taking, it was still not clear whether the projected highway improvement would go through the subject property or around it. Undoubtedly to guard against the eventuality of condemnation, the tenant on April 13, 1961, obtained a ground lease of an adjacent 26-acre parcel  for the lower annual rental of $52,500  and, after the taking of the subject property, transferred its Korvette subleases to that adjoining parcel. It was on this new site that a shopping center was subsequently erected; somewhat larger than the one planned for the subject property, it was completed and in operation long after the taking but before the trial.
The conclusion of the courts below  that the rental income actually being earned by these buildings was not presumed or hypothetical and was, therefore, properly used as the basis for income capitalization of the sublease rentals of the subject property  was egregious error. So, too, was the treatment accorded the ground lease, for the courts below not only capitalized the rentals for its first 10 years but proceeded to treat all the other terms of that lease as self-executing. For example, the courts assumed that the ground tenant would exercise an option in the lease to purchase the land at the end of 10 years and, having made that assumption, they then simply added the present worth of the supposed purchase price to the present value of a 10-year flow of rent in order to determine the award to be made to the fee owner.
Such a use of the experience of the project on the adjacent site, a project on which construction had not been commenced on the day of the taking, was in violation of the principle that, to determine the market value of land appropriated, we must look to the situation existing on the day of the taking. It matters not that, in the case before us, the project had in fact been developed on adjacent property prior to the trial. The significant fact is that it was not begun until after the appropriation. To sanction the capitalization of income method adopted below would be to overturn the long-established and wise rule, reflected in our Levin decision (13 N Y 2d 87, supra). It would be a serious departure from principle, and most unsound, to announce that *355 fair compensation is to be determined not as of the day of taking but, instead, as of the time of trial, whenever that might happen to be.
Additional error was committed by the rejection below of the settled procedure followed in valuing real property in which a tenant may have a leasehold interest that survives the taking. Such procedure is, first, to value the unencumbered fee  thereby determining the value of all the interests taken[3]  and, then, to determine the value of the tenant's interest, if any  such value being dependent upon whether the rental value of the land is greater or less than the rent reserved in the ground lease. If there is an excess rental value, the worth of that excess is the amount to be awarded to the tenant. That amount is carved out of the amount of the total award  the value of all the interests in the land taken  and the balance is the sum to be awarded to the owner of the fee. (See, e.g., Great Atlantic & Pacific Tea Co. v. State of New York, 22 N Y 2d 75, 84; Matter of City of New York [Allen St.], 256 N.Y. 236.)
Instead of determining the tenant's interest in the manner just indicated, the courts below valued it by capitalizing  after deducting an estimated return on the buildings and the ground rental  the rent of $285,000 to be paid by the subtenant. This was error not only because the land was still vacant and raw on the day of taking but because the value of the subleases to Korvette was already reflected in the size of the ground rent of $61,250 which had been arrived at in express contemplation of the subleases to Korvette and the eventual construction of the buildings and other improvements by the ground tenant. To state the matter somewhat differently, the sublease rental of $285,000 (payable by Korvette) was to be the reward to the tenant for investing several million dollars in construction costs and for gambling on the eventual success of the shopping center. The land was simply one component of the enterprise.
No shopping center was appropriated by the State. The vacant lot which it took was not a shopping center and, certainly, the agreements among financially responsible people about what *356 they planned to do in the future with that lot did not transform it into one. The ground lease rental was one reflection of the value of the land; the sublease rental was only remotely such a reflection. This is not to say that it was improper for the trial court to receive the subleases in evidence as bearing on the issue of highest and best use but it was grave error to give them the weight which was accorded them.
Upon the retrial, the value of the entire land  that is, the value of all the interests in the land  should be determined by reference to the sales prices and ground rentals paid for neighboring or competitive lands. This would include the ground rent of $52,500 which the tenant contracted to pay for the adjacent property to which the Korvette subleases were transferred. (See Levin v. State of New York, 13 N Y 2d 87, 91-92, supra; see, also, 31 A D 2d, at pp. 229-230, per REYNOLDS, J., dissenting.) Capitalization of the $61,250 ground rental may be properly used as one of the indicia of value of the vacant land, since, as already noted, such ground rent reflected the opinion of experienced businessmen as to the value of this vacant land for shopping center use. As for the capitalization rate to be employed, we agree with the view expressed by Judge REYNOLDS, in dissent, that the rate must be not only one with support in the evidence but one which indicates that the rental income to be derived from this ground lease was, on the day of taking, "subject to more than the usual risks" (31 A D 2d, at p. 231).
In valuing the tenant's leasehold interest, the inquiry upon the new trial is to be confined to ascertaining whether the rental value of the vacant land was greater or less than the ground rental of $61,250 a year. The leasehold interest is not to be valued according to the method, adopted by the courts below, of valuing that interest on the basis of what the tenant hoped to earn from its speculative investment of millions of dollars in buildings not yet built and a business not yet in operation. On this issue of rental value, the State points to the fact that the tenant succeeded in obtaining, about a month before the taking, the long-term lease of adjacent property to which we have referred. That rent was $52,500 a year for property virtually a twin, in size and location, of the subject land. Manifestly, this goes far toward demonstrating that the claimant tenant had no leasehold interest at all, since such rental would indicate that *357 the rental value  the market value of the leasehold  was less than the $61,250 ground rent stipulated in the lease. This being so, there is much to be said for the view expressed by the dissenting Appellate Division justices that the tenant's claim be dismissed. However, since the trial court found, in another context, that this adjacent parcel may not have been "as attractive and favorable" as the subject property, it is our conclusion that the tenant should be privileged to prove, if it can, that competitive land for shopping center use commanded, at the time of the taking, a higher rental than at the rate of $61,250 for 26 acres.
We also agree with the dissenters below that the claimant tenant, by moving its shopping center project to the vacant neighboring parcel, retained all of its potential profits under the Korvette subleases and that, consequently, the award gives the claimant a windfall by allowing it compensation for the fictional loss of such benefits. As Presiding Justice HERLIHY put it, "`[j]ust compensation' requires a holding that Arlen is not entitled to receive the full financial benefits from its sublease and also receive compensation for the fictional loss of such benefits" (31 A D 2d, at p. 228).
In sum, the erroneous methods of valuation to which we have called attention require a complete retrial of the claim of the fee owners as well as that of the tenant and, accordingly, the orders appealed from should be reversed, with costs, and a new trial ordered.
BREITEL, J. (dissenting in part).
There is no disagreement that the award to the tenant is excessive and that a reversal and a new trial is required as to that claimant. There is disagreement, nevertheless, whether the tenant's interest is to be valued on the basis that only the taking of raw land for a yet-to-be financed project is involved. There is complete disagreement whether the valuation of the land owners' interest may be reviewed in this court, that award having been affirmed in the Appellate Division on an issue of fact supported by the evidence. Hence, as to the owners there should be an affirmance.
A few preliminary observations will be helpful before considering the case in detail.
In the first place, it is immaterial as a matter of law, although undoubtedly it must influence one, that the fee owners would *358 receive several times their original investment. They are entitled to the value of their property at the time of taking whether it was their enterprise or ingenuity, or only good fortune which enabled them to foresee, assemble, and initiate an actual development which caused the increase in value over a 15-month period.
Secondly, the assembled plot, apart from assembly, at the time of the taking, was being cleared for a week in preparation for construction, the ground lease and subleases had been granted, a rezoning of critical significance had been obtained by the tenant, and a mortgage commitment in the amount of $2,000,000 had been secured. Building plans had been filed and a building permit issued. If this be raw land on which not a shovel of earth had been turned, it was also a project in inception and not merely an idea in a promoter's mind.
Thirdly, the record establishes that what occurred between the two sites, the one taken in eminent domain and the other on which the Korvette shopping center was built, was a shifting of the project only because of necessity created by the State's appropriation of the first site. The promoters had intended to build two shopping centers, and at the time of the taking there were active negotiations for occupants, other than Korvette, at the second site. The result of the taking was that only one shopping center was ever built.
Lastly, the experience on the built-on site is usable only as a reference for verifying the potentialities at the time of taking and not because the tenant is entitled to anything but the value at the time of the taking. Such value does not, emphatically does not, include the reward in the form of future rents for services not yet rendered at the time of the taking. It is because of this last qualification that it is concluded that the award to the tenant is excessive.
During the 15-month period preceding the taking date, May 10, 1961, the fee owners had assembled for development as a regional shopping center, a 26.783-acre tract of land along Route 59 in Nanuet, Rockland County, at a cost of $247,800. On January 4, 1961 the tract was leased to the tenant, Banner Holding Corp., wholly owned by Arthur Levien and Arthur Cohen, two experienced shopping center developers. The initial term was *359 25 years at an annual rate of $30,000 for the first year and $61,250 thereafter. Banner had an option to renew for three additional periods of 25 years each and an option to buy the land between the 11th and 15th years for $31,000 per acre; $32,000 per acre between the 16th and 20th years; and $33,000 per acre between the 21st and 25th years. The fee owners had previously, but unsuccessfully, attempted to obtain Korvette as a tenant for this tract. After the taking, this lease was assigned to claimant Arlen of Nanuet, Inc., also wholly owned by Levien and Cohen.
On March 7, 1961, two months before the taking, Banner had entered into three separate subleases with Korvette covering the entire leased property. Each of the three subleases was for an initial 25-year term, with two renewal options of 10 years each.
Following the taking on May 10, 1961 all leases were canceled. The Korvette project was not abandoned, however, but instead transferred to a nearby 26-acre site located on Route 59. This site, later described as the "built-on" site, had been leased from Kegg Co. by Arlen Operating Corp., also wholly owned by Banner's principals, on April 13, 1961. Arlen Operating Corp., by the terms of its lease, agreed to erect a department store on this "built-on" site for a subtenant "having an AAA Dun and Bradstreet rating and a net worth in excess of Eight Million Dollars ($8,000,000)." Thus, there was contemplated, by Cohen and Levien, two adjacent shopping centers, one (the subject site) to be occupied by Korvette as the prime tenant and the other to be occupied by another prime tenant. A plan for this second site had been prepared sometime between January and May, 1961. Among those apparently interested in the second site were Woolworth's and Charles Department Stores.
As found by the Court of Claims, the State had previously assured both the fee owners and Banner that it had no definite plans to acquire the subject site, but rather that if the proposed shopping center were built before a highway relocation plan was definite, the proposed relocation would not interfere with the shopping center.
On May 10, 1961, however, the State, without prior notice, filed its appropriation map. Appropriated were 16.009 acres, in fee, *360 leaving to the owners two separately severed parcels, one 9.374 acres, the other 1.40 acres. As a tenant for the second site had not yet been located, the Korvette shopping center was constructed on this second or "built-on" site, in a manner virtually identical to that planned for the subject site.
Seeing the problems in this case in a proper perspective requires an understanding of the role played by Banner. It was not just another lessee of land for development. Notably, in July or August, 1960, after Korvette had rejected solicitation by the fee owners because, as noted by the court, "Korvette operated only through Banner", the president of Korvette approached Banner's principals, Levien and Cohen, for the purpose of "going into the Rockland-Nanuet area." Korvette was initially interested in the later "built-on" site which was already assembled except for a gore yet to be purchased. Instead the subject site was offered. When the subject site was viewed, Korvette was even more enthusiastic. By September 8, 1960, the principals, through Banner, had begun preparation of the subject site for Korvette's use.
In January, 1961, when Banner and the fee owners executed the ground lease for the subject site, only a portion of the tract was zoned C-2, permitting erection of a shopping center. On application of Banner, the Town Board of the Town of Clarkstown rezoned the entire site to C-2.[1]
This application pertained only to the subject site. Building plans were then filed by Banner, and a building permit issued on May 8, 1961. At this time Banner had been engaged in clearing the subject site for about a week. In further preparation for construction of the Korvette buildings, a $2,000,000 mortgage commitment had already been obtained by Banner at the time of the taking.
Because of the taking, as noted earlier, the lease and subleases on the subject site were canceled. Thereafter, on June 30, 1961, Korvette entered into subleases with Arlen Operating Corp. providing for construction of virtually the same shopping center on the adjacent "built-on" site. Korvette agreed to pay the same rent of $285,000. By the time of trial, moreover, there were erected on the built-on site, the very buildings which had *361 been contemplated for Korvette and other satellite subtenants on the subject site.
The Court of Claims, finding that the value of the subject site was largely influenced by the Korvette subleases, rather than by the ground lease to Banner, computed the unencumbered fee value of the site to be $2,220,000. This sum was derived by first computing the net annual rental income from the built-on site. Included was the $285,000 rent payable by Korvette, rent for a Korvette addition, and rent paid by the satellite stores, items to be considered differently by the Appellate Division (31 A D 2d, at p. 227). The total net rent was thus $443,114. The court deducted from this net rental income the return and recapture of the building investment, to obtain a residual net income allocable to the land of $155,656. This residual net income of $155,656 was capitalized at 7% to arrive at the $2,220,000 unencumbered fee value.
The Court of Claims then independently computed the value of claimants' separate interests. The fee owners' interest was determined by calculating the present value of their right to receive future income under the ground lease with Banner. This income consisted of annual rents over a 10-year period. The court, assuming that Banner would exercise its option to buy the property at the end of the 10-year period, then calculated the present value of the fee owners' future right to receive the purchase price. Applying a 7% annual discount factor, the court found a before-taking value to the fee owners of $823,610. After deducting an after-taking value of $121,000, for the part of the site not taken, the court awarded the fee owners $702,610 (50 Misc 2d 934, 949, 951).
In computing the value of the Banner leasehold the court started with the net land rent payable to Banner by Korvette and the other subtenants, as previously computed by the land residual method to determine the value of the unencumbered fee. From this $155,636[2] annual sublease rent the court subtracted the $61,250 annual rent Banner had to pay the owners. Thus the court determined that Banner would receive an annual surplus of $94,386 over its ground rent for 10 years. Upon exercising its option after 10 years and purchasing the property *362 for $830,273, Banner would receive a net annual rent of $155,636[2] for the next 15 years. If Korvette renewed its sublease, after 25 years, Banner, now the fee owners, would receive $155,636[2] a year for an additional 15 years. The court assumed that 40 years would be the economic life of the improved property, and that at the termination of the Korvette lease, as renewed, Banner would receive the reversion, previously valued at $2,220,000. In calculating the value, at the time of taking, of the right to receive this stream of future income and the reversion, the court adopted rates reflecting significantly higher risks than it had used previously in calculating the unencumbered fee value. It did so to reflect risks of vacancies, bankruptcies, depressions, and Korvette's failure to renew. Thus the annual rate, reflecting present worth of future income, for the first 10 years' payments was 8%, for the next 15 years 9%, and for the final 15 years 12%. Similarly, the annual discount rate for the reversion after 40 years was set at 9%. The present value of these aggregated and discounted future payments was calculated at $944,135, which was further reduced to $875,000 for reasons which are not altogether clear (50 Misc 2d 934, 949-950, see, also, p. 947).
The Court of Claims stated "that under no circumstances may we discard the principle that first we determine the value of the whole as a package and then apportion the several interests within the whole" (50 Misc 2d, at p. 943). This rule, however, was apparently disregarded. As the Appellate Division noted, the Banner interest of $875,000 and the owners' interest of $823,610 aggregate $1,678,610, a sum substantially short of $2,220,000, the value previously attributed by the court to the unencumbered fee. This failure of the value of the whole unencumbered fee to equal the sum of its parts, can be explained to a significant extent by the limited application of risk factors found by the Court of Claims. The court capitalized the annual income on the Korvette lease to arrive at the value of the land as unencumbered. It used a capitalization rate of 7%, thus indicating that the income was relatively stable and of long duration. Yet in valuing the right of Banner to receive payments under the very same lease used to calculate the unencumbered *363 value of the land, the court noted risks of vacancies, bankruptcies, depressions, and uncertainty of renewal, and discounted the value of future payments accordingly, with rates commencing at 8% and reaching as high as 12%. Since the risks in the Korvette lease are inherent to every economic aspect of the project, they should have been reflected in any valuation based on the Korvette lease, both as to the value of the unencumbered land and Banner's leasehold interest. This, in part at least, would explain what troubled the Appellate Division.
The Appellate Division made light of the discrepancy, concluding that "since the total of the awards is not larger than the over-all fee value, the State has not been prejudiced" (31 A D 2d, at p. 226). However, the Appellate Division found "that in transferring the figures for the `built-on' site to the subject property, neither the court nor the tenant's appraiser made an allowance for the fact that on the day of the taking, the subject land was virtually unimproved and was not fully subleased. The values derived from the `built-on' parcel * * * could not be employed without adjustment because they represented the value which the site would have had after all improvements had been completed and all subleases obtained." (id.).
The Appellate Division agreed that values on the subject site could be calculated only from the Korvette sublease, the only sublease extant at the time of taking. It then subtracted $285,000, the Korvette contract rent at the time of taking, from $443,114, the net annual rent of the "built-on" site as fully improved. The difference of $158,114, or 40% of the total, was found to be "uncertain economic rent at the time of the appropriation", which could not be used to prove leasehold value. The award to the tenant was, therefore, reduced by 40% to $525,000 to reflect the actual circumstances at the time of taking.
The award to the landlord, however, was affirmed. The Appellate Division found that the 7% capitalization rate used by the Court of Claims was within the range of the evidence.
A preliminary issue is whether the courts below erred in valuing the separate interests in the parcel taken. In Great Atlantic & Pacific Tea Co. v. State of New York (22 N Y 2d 75, 84) the court recently said: "Generally speaking, where there are two or more interests or estates in a condemned parcel, the proper *364 mode of assessing damages is to ascertain first the damage to the fee as if it were unencumbered, and then to apportion that amount among all of the estates and interests which are held in the property". This is the well-established rule in this country (see, e.g., Chicago, B. & Q. R. R. Co. v. Reisch, 247 Ill. 350; State v. Lenox, 237 N. E. 2d 248 [Ind.]; City of St. Louis v. Rossi, 333 Mo. 1092, 1102-1103; Sowers v. Schaeffer, 155 Ohio St. 454; Ann.  Condemnation  Valuing Separate Estates, 69 A. L. R. 1263, supp. 166 A. L. R. 1211; 1 Orgel, Valuation Under Eminent Domain [2d ed.], § 109; 4 Nichols, Law of Eminent Domain [3d ed.], §§ 12.36, 12.42, p. 293; 29A C. J. S., Eminent Domain, §§ 136[8], 197-198).
But, in Matter of Trustees of New York & Brooklyn Bridge (Clark) (137 N.Y. 95, 97), cited in the Great A & P Tea Co. case (supra) the court had stated: "The appraisers in such a case may pursue either one of two methods. They may appraise the entire value of the premises and then apportion such value among the fee owners and tenants, or they may in the first instance appraise the value of each separate interest and thus ascertain the entire value. The process in each case must obviously be substantially the same. They must, in any event, appraise the value of each interest separately" (see Pekofsky v. State, 15 Misc 2d 358; 19 N. Y. Jur., Eminent Domain, §§ 108, 115).
The statements are reconcilable. Both cases apply the same principle, namely, that the several values of separate interests in the same property must generally equal the valuation of the whole unencumbered fee. True, the Brooklyn Bridge case (supra) suggested that it made no difference which mathematical route was pursued, but it made it just as clear that on both methods substantially the same result must ensue. This suggests that the two methods may be used mathematically as a check of the one upon the other, and a discrepant result should require a review of valuation procedures rather than the dominance of one result over the other. The last-quoted sentence in the Brooklyn Bridge case (supra) is unqualifiedly true; the separate interests must eventually be appraised and stated separately.
But the principle is not absolute. There are rare and peculiar exceptions in which the value of the unencumbered fee is greater *365 than the aggregate of the values of the separate interests (e.g. Matter of City of New York [Public Beach], 269 N.Y. 64, 69; Boston Chamber of Commerce v. City of Boston, 195 Mass. 338, affd. 217 U. S. 189). The cases always involve unusual circumstances, such as when land, burdened by a prior easement, is taken for a purpose which is at least as beneficial as the easement. Thus, for example, land with an easement for light and air on abutting land sustains no loss from the destruction of the easement by the taking of the servient estate for a public street. (See, generally, 1 Orgel, op. cit., supra, § 111.)
There are also cases where the aggregate value of the several interests exceeds the value of the unencumbered fee (e.g. Baltimore v. Latrobe, 101 Md. 621; State ex rel. McCaskill v. Hall, 325 Mo. 165, 172 [dictum]; see, also, People ex rel. Department of Public Works v. Lynbar, Inc., 253 Cal. App. 2d 870, where the court disregarded the unencumbered or undivided fee rule in construing a statute discussed in Note, The Undivided Fee Rule in California, 20 Hastings L. J. 717; 1 Orgel, op. cit., supra, § 111).
Because of the rarity and peculiarity any discrepancy must be explainable or it stands as evidence of unsoundness in method of valuation.
As strenuously urged by the tenant, absent special circumstances, the difference between the interest of the fee owner and the value of the unencumbered fee, if any, should equal the award to the tenant (Matter of City of New York [Delancey St.], 120 App. Div. 700, 706-707). Since the figures are not in agreement there must be an arithmetical error, or the valuation of either the separate interests or the unencumbered fee followed an improper method (see, however, Polasky, The Condemnation of Leasehold Interests, 48 Va. L. Rev. 477, 490-493, suggesting that the two methods are not always absolutely reconcilable). Of course, as observed earlier, a likely explanation is the different risk factors applied by the Court of Claims in valuing the leasehold interest and the unencumbered fee.
In any event, with respect to the tenant's claim, the case should be remanded to the Court of Claims for a revaluation of the leasehold and the unencumbered fee to resolve the discrepancy.
Another issue, and it is upon this issue, more than any other, that this court divides, is whether all or any portion of what the *366 State decries as the "hypothetical" rental value derived from the built-on site may be utilized in determining the unencumbered fee value of the subject site.
Concededly, a method of valuation based on rents or other income from a hypothetical structure would be improper. This is similar to the rule that valuation based on anticipated loss of profits is generally improper because too speculative (Woodruff, Legal Damage in the Partial Taking of a Leasehold Interest, 1963 Inst. of Eminent Domain 137, 146; 5 Nichols, op. cit., supra, § 19.3). In Tallman v. Metropolitan El. R. R. Co. (121 N.Y. 119, 125) it was said: "There can be no certainty that the plaintiff would ever have erected dwelling-houses upon the lots, and there could be no certainty as to the rents which could have been obtained from them either with or without the railroad in the street" (see, also, Matter of City of New York [Blackwell's Is. Bridge], 118 App. Div. 272, 274-275, app. dsmd. 189 N.Y. 512; Levitin v. State of New York, 12 A D 2d 6, 7).
But, where, as in the unusual circumstances of this case, there was substantial certainty that the structures would be erected on one site or the other, and the prospective rents were shortly realized from a remarkably closely comparable site, capitalization is allowable of the net rental income from existing subleases which would have been realized if the building had been erected and the rents had been paid on the subject property. The courts have realistically accepted prospective yields from improved land where the prospect is much more than a gleam in the exploiter's eye and there has been partial exploitation coupled with circumstantial evidence that only the taking has prevented fulfillment of economic potential (Levin v. State of New York, 13 N Y 2d 87, 90-91; Mattydale Shopping Center v. State of New York, 303 N.Y. 974, revg. 279 App. Div. 704; Crimswal Realty Corp. v. State of New York, 27 A D 2d 350, 352; see, also, 1 Orgel, op. cit., supra, § 186). In United States v. 25.406 Acres of Land (172 F.2d 990, 992), the court, allowing equally persuasive evidence, said: "The testimony in question * * * related not to the nebulous cost of constructing a vague hypothetical project and the estimated income to be derived therefrom, but to the cost and expected income of a project which, according to the evidence, was definitely in the process of achievement."
*367 Indeed, in the Levin case (supra, at p. 91), it was said of the issue common to this case that: "It does not follow, however, that the Court of Claims erred in receiving the evidence of the lease, the prospective net rental income, the plans to develop the subject property and the evidence relating to construction costs. A sagacious and experienced prospective purchaser on the day of the taking would undoubtedly have taken into consideration the net rental income which might have been derived from this property if the taking had not intervened and if the executed lease had been fulfilled. That is not to say that he would give as much weight, if any, to the conjectured net rental income earnings of a hypothetical building neither erected nor required to be erected by any lease or agreement. That case is not before us. Nor would one expect the prospective purchaser to pay for the vacant land in suit an amount equal to the worth of the conjectured net rental income  deducting, of course, construction and other costs necessary to complete the building  for, then, he would be paying an amount which would preclude any profit. What the purchaser would pay for the property would undoubtedly be influenced by the extent to which the property had been exploited. The purchase price would also, and more directly, be determined by what other properties were selling for or by what competitive alternatives were available to the purchaser."
By the time of the trial the Korvette shopping center was no longer merely projected but actually constructed, organized, and in full operation. There was now hard proof that the very same shopping center which was to have been constructed on the subject site would have, with all but absolute certainty, yielded the projected rental earnings from subleases in effect on the day of the taking. The rental income capitalized constituted, at the very least, "clearly to-be-expected future earnings" of a category with those allowed in St. Agnes Cemetery v. State of New York (3 N Y 2d 37, 45, citing, inter alia, Mattydale Shopping Center v. State of New York, supra).
The Court of Claims erred, however, in using the entire net rent of $443,114 derived from the completely improved "built-on" site. This $443,114, the Appellate Division correctly found, included $158,114 rentals derived from satellite subleases which were not even in existence at the time of the *368 taking. The Appellate Division, therefore, reduced the net rent to $285,000, the return from the Korvette sublease (31 A D 2d, at p. 227).
The last conclusion, and the immediately preceding discussion, however, brings in its wake a qualification, and, therefore, another issue.
Even if recognition is accorded to the serious potential of the projected shopping center on the subject site, there is still an economic gap between potentiality and realization to be explored and evaluated. There are economic costs yet to be incurred even if there are only minimal speculative risks between the stages of potentiality and complete fulfillment. It is less than clear that the Appellate Division's adjustment purported to or could discount adequately the co-ordination or entrepreneurship that Banner provides in developing shopping centers.
The key to this particular problem is suggested by the refusal of Korvette to engage in the project when first suggested by the fee owners. Korvette would deal with no one but Banner. Banner was a specialist in developing shopping centers. It leases the land, obtains zoning modifications, arranges financing, manages construction, obtains tenants and subtenants. These steps require highly skilled and energetic services and facilities with others for the making of the necessary arrangements. It involves extensive planning and supervision during the somewhat protracted period of development. Notably, it is an increment assignable to the project as a whole and not to the several buildings erected.
It is undoubtedly for this reason that Korvette's rent to Banner is so much greater than the ground rent, even after adding "normal" rent for the improvements. Built into the Korvette rent is undoubtedly an amortized amount to reimburse Banner for its entrepreneurship in the development of the project. Once the project is completed this added increment for exploitation, entrepreneurship, or coordination, whatever it may be called, is of course a proper element of the rental value of the project (The Appraisal of Real Estate [3d ed.], pp. 33-35, 299-300). But until the project is completed, more or less, depending upon the stage of development, a part of this increment has not been "earned." It is, therefore, not properly includible in the rental value of the leasehold. It must be emphasized *369 anew that there is a difference between an organized shopping center with buildings, taken as a whole, and the several buildings erected on the site.
The fact that Banner already had the Korvette lease at the time of the taking does not change the result of this analysis. Banner was still obligated to perform a large if not the much larger part of its entrepreneurship, of which obtaining additional subleases was only a small part. By reason of the transfer of the project to the built-on site these prospective services of entrepreneurship were eventually incorporated into the built-on site and enhanced the value of the built-on site, taken as a whole shopping center ready to function as such. Most of that development had not yet occurred on the subject site at the time of the taking and, therefore, represented an obligation by Banner, still undischarged.
At time of taking the developers had arranged for a mortgage commitment, effected a zoning change, obtained a building permit and had begun clearing the site. To be sure, these substantial activities had enhanced the value of the subject site at the time of the taking. Much more remained to be done, however, before the property, as a shopping center project, would be worth the agreed rent. The success of the development still depended as much or more on the skill and ability of the developers than on the location of the project (see Sparkill Realty Corp. v. State of New York, 268 N.Y. 192, 197; cf. Matter of City of Rochester [Smith St. Bridge], 234 App. Div. 583, 587; see, generally, The Appraisal of Real Estate [3d ed.], supra, pp. 33-35, 299-300).
There are parallel analyses. Although involving a more commonly recognized range of values, it was said in Banner Milling Co. v. State of New York (240 N.Y. 533, 543-544, cert. den. 269 U. S. 582) that a court in an eminent domain proceeding must consider "the cost necessarily or reasonably expended in bringing the mill or factory into efficient working condition, what has been called the synchronizing of its parts. Architect's fees in making or revising plans, compensation for engineers to carry out the plans or to arrange the factory so as to produce appropriate manufacturing results are all elements which should be considered in estimating the market value. These are things which a seller and a purchaser would consider on a sale" (see, *370 also, Matter of City of New York [Fifth Ave. Coach Lines], 22 N Y 2d 613, esp. 621-622, on prior appeal 18 N Y 2d 212, 221-224; Rustcon Developers v. State of New York, 33 A D 2d 582; Brighton Plaza v. State of New York, 32 Misc 2d 266, discussing many of the hurdles, economic, topographic, and legal, to be overcome in developing a completed shopping center).
What is seen on the "built-on" site is the actual result of the effort and expenditure of entrepreneurial talent. The trial court, in determining the value of the subject site should have discounted, therefore, so much of the co-ordination or entrepreneurial factor from the $285,000 net rent as had not yet been justified.
The Appellate Division's correction in eliminating the satellite rents from the computation of the rental value of the subject site, therefore, did not go far enough. Nor is it sufficient in analyzing the value of a completed shopping center merely to take account of architects', engineers' and related fees and expenses for the construction of the individual buildings. It was still necessary to discount the Korvette rent of $285,000 for the amortization it included of compensation to Banner for development of the project to the extent that such development had not yet taken place. The fact that through future efforts further development of the project was to take place on the built-on site does not inure to Banner's benefit, even if Banner be given credit for planning two shopping centers rather than only one. Had Banner been able to proceed with two shopping centers it would still have been obligated subsequent to the taking to exert its entrepreneurial effort for each of the two sites, before it would have earned its entrepreneurial compensation and profit for either or both.
For this reason, too, a remand to the Court of Claims is required with respect to the tenant's claim in order that, by adjustment, an accurate and uninflated land value may be computed.
The award to the fee owners, on the other hand, was properly computed. Both the appraiser for the State and the appraiser for the fee owners considered the contract rent reserved under the Banner ground lease and not the apparently more speculative Korvette sublease. Both, therefore, used an identical stream of income. Unlike the tenant, the fee owners undertook *371 no future obligations for which the reserved rent included any component, amortized or otherwise. The State's appraiser would have capitalized this rental at 9%; the fee owners' expert at 6%. The Court of Claims adopted a 7% capitalization rate. This was within the range of the evidence. Moreover, the choice of the capitalization rate is one of fact and since it is supported by substantial evidence "is immune from further review" (St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, 47, supra; Matter of City of New York [Sound View Houses], 307 N.Y. 687, 688).
Unlike the situation with respect to the tenant's interest it was not necessary to compute the value of the unencumbered fee in order to assess the fee owners' interest. Instead, the value of the owners' interest was determined more directly by capitalizing the rental value to the owners in the fashion just described. As a result, while there must be a review of the assessment of the unencumbered fee value in valuing the tenant's interest a similar review is not required as to the owners' interest. Moreover, as argued by the fee owners, the separate judgment in their favor, to the extent that it rests on affirmed findings of fact, is not vulnerable in this court on any issue of fact.
Accordingly, I dissent in part and would affirm the order as to the fee owners' judgment and would reverse as to the tenant's judgment, and remand its claim to the Court of Claims for a new trial.
Orders reversed, with costs to appellant State of New York and a new trial granted.
NOTES
[1] Even after the amount had been reduced by the Appellate Division to $1,227,610, the award, per acre, for the 16 acres involved is nine times more than the purchase price, per acre, paid by the owners for the entire 26-acre parcel but a few months before the taking.
[2] We call attention to the dissenting opinion (in Levin) at the Appellate Division, written by then Presiding Justice BERGAN, which states the matter well (17 A D 2d, at p. 339): "But there were no improvements on this land when the State appropriated it. To treat a plan to put up a building as a building that has been put up; and then to capitalize the rent reserved in the lease as though the building had been put up and occupied and the lease had successfully run its full course to the end, seems an unrealistic approach to a proper award in condemnation."
[3] In the case before us, there was a partial taking, 16 acres of a 26-acre tract. The value of the 10 acres of land retained by the owners after the taking would, of course, have to be deducted from the value of the entire tract to determine the amount of the total award.
[1] The rezoning alone could increase the value of the property several times.
[2] The Court of Claims used $155,636 instead of $155,656 which it had earlier calculated as the "net income residual to the land" (50 Misc 2d, at pp. 948, 949).