Alexander Del Giorno, J.
On August 28, 1946, claimant Garfield Homes, Inc. (hereinafter called Garfield) bought the improved parcel in question. It was located on the northwesterly corner of Willis Avenue and Jericho Turnpike, Floral Park, N. Y. It actually consisted of two parcels, one a parcel 50 feet, front and rear, by .125 feet on both sides which was improved with a taxpayer of like dimensions, used exclusively by claimant the Great Atlantic & Pacific Tea Company, Inc. (hereinafter called A & P) as a supermarket, and an adjoining lot on the rear which was 25 feet by 100 feet, the front 25 feet facing on the westerly side of Willis Avenue, which although contiguous to the improved lot was vacant and used for parking of cars. The taxpayer was brick on all sides except the westerly side, which was cement blocks.
The area of the land and the store directly affected by the appropriation was 6,250 square feet.
*740 On October 30, 1959, the State took in fee the entire frontage along Jericho Turnpike to a depth of 18 feet on the easterly side and 19 feet on the westerly side of the building, comprising 925 square feet, and additionally acquired a temporary easement to permit the demolition of that portion of the building taken in fee. The easement extended across the entire 50 feet for 10 feet beyond the fee taking, comprising an area of 500 square feet.
The actual fee taking comprised 15% of the improved parcel, and the combined fee and temporary easement about 22% plus thereof.
A & P had been a tenant since the year 1936.
Claimant’s Exhibit 6 is the lease dated March 8, 1946, made between the prior owner and A & P, which ran from May 1, 1946 to April 30, 1950 at $4,000 per year, with three options to renew said lease for seven additional years with a maximum rent of $4,800 yearly.
On October 10, 1956 the two claimants entered into an agreement extending said lease from May 1, 1957 to April 30, 1964 at $6,500 yearly rental, with an option to renew for five more years at $7,099 yearly rental. This latter lease was operative on the date of vesting.
Subsequent to the vesting date, and to meet the circumstances arising from the taking, the claimants agreed in July, 1960, on the terms of a proposed lease in which A & P agreed to pay, beginning February 1, 1961, $9,000 yearly for 10 years on condition that Garfield would rebuild the front of the store and extend the building and cellar to 125 feet, by using a portion of the rear lot. This work would have cost Garfield $7,613 for the front and $11,890 for the rear extension and full basement. However, A & P having requested a more elaborate rebuilding job which would cost more, claimants agreed on that basis on a prospective yearly rental of $10,200. This proposed lease was never executed by A & P, although negotiated by its vice-president in charge of the area, whose prerogative was to find locations and negotiate leases, among other things.
The lease of March 8, 1946 was on a form provided by A & P and it contained no provision for the abatement of rent in the event of condemnation.
It was agreed that although the State served a notice to quit on A & P on July 9, 1959 to be effective by December 30, 1959, A & P remained in full, undisturbed possession to June 30,-1960 and paid its rent to Garfield to that time.
Towards the end of June, 1960 A & P, without consultation with the State or Garfield, through the use of its own mainte *741 nance department employees, dismantled the entire store, taking away what they thought could be reused and dumping the rest. In this regard it may be well to recall that G-arfield had been willing to make an entrance door on the Willis Avenue side of the building to allow A & P to continue operating, but A & P rejected the proposal claiming it could not operate under those circumstances.
The testimony of Mr. John E. Andrews, then a vice-president of A & P who, as aforesaid, was in charge of stores in the area from Jamaica to Montauk, disclosed that up to about 1958, a 6,000 square foot store was considered adequate by A & P, but ■that since then larger stores up to 12,000 square feet are required by A & P for supermarkets.
Mr. Andrews testified that he did not know what became of the fixtures removed from the store and, although he stated the maintenance department had an inventory of such fixtures none was presented at the trial.
Mr. Andrews claimed that the store as now left by the appropriation was too short for their operation, although had the vesting not occurred he would have recommended the continuation of the five-year option period on the existing lease to April 30, 1969.
Regarding the A & P’s claim for fixtures, A & P employed Mr. Arthur Schaff, an expert appraiser of fixtures, who made an inventory of the same in October, 1959, eight months before the A & P vacated the premises, which indicated then a sound value of $45,082. However, Mr. Schaff did not know what became of the fixtures thereafter, nor could he say which of the fixtures were in the part of the store taken by the State.
Rubin G-arfinkel, vice-president of G-arfield, testified that soon after the vesting the A & P asserted to him that the store was too small for them as a result of the taking. To permit continued operation, he offered to build an entrance on the Willis Avenue side, but the A & P refused the offer. However, Mr. Andrews, for A & P, agreed to negotiate a new lease based on a reconstituted store of 125 feet in length and a full cellar, to which we have alluded ante. The proposed lease was not accepted by the management of A & P. Mr. Andrews testified that during the course of the work there was no access to the building from Jericho Turnpike, although he conceded that there was a door from Willis Avenue.
The State offered a certificate of its district engineer indicating that the completion of the demolition work on Jericho Turnpike was accepted by the State from the contractor on April 24,1961. The testimony was clear that neither claimant *742 thereafter made any move to reconstitute the building for the business of A & P or any other use.
The State erected a in front of the remaining portion of the building about March 1, 1962. The building has remained vacant.
The State, as required by subdivision 20 of section 30 of the Highway Law, filed in the office of the Department of State a certificate of termination of the temporary easement on August 13, 1963.
The evidence also shows that there was pending in the Nassau County District Court an action for rent claimed to be due on the lease after June 30, 1960, instituted by Garfield against A & P.
It was undisputed that in 1957 the owner remodeled the whole store front while A & P extensively renovated the interior of the store; that the store had been a profitable one with net profits averaging better than $20,000 per year.
The experts for the owner as well as for the State agreed that the economic rent value for the feehold was $9,000, while the contract rent, as above stated, was $6,500 yearly to April 30, 1964 and $7,099 for the five years’ optional renewal to April 30, 1969.
The owner, Garfield, claims (1) damages for that portion of the land and building appropriated, (2) damage to remaining land and building, (3) loss of rent on lease, (4) repairs to building and (5) rental value of temporary easement.
A & P claims as follows: (a) value of leasehold, (b) cost of removing fixtures, (c) depreciated value of fixtures removed, (d) loss of profits and (e) cost of reopening store. The last item, (e), was withdrawn at the beginning of the trial.
We have synopsized the various issues and factual elements presented at the trial in order to make clear the determinations to be made herein, as well as to offer an explanation of the disposition of the findings and conclusions of law submitted by both sides.
The following events stand out: (1) the State filed its appropriation and temporary easement maps on October 30, 1959; (2) the State filed its certificate terminating the temporary easement on August 13, 1963, although it presented proof that the demolition contract was completed April 24, 1961; (3) the A & P, on June 30, 1960, without compulsion from the State or prior notice to the State or Garfield, abruptly moved out and removed with its own work force all the alleged fixtures within the store, saving what it chose to save and dumping the remainder; (4) the taking was only of a portion of the premises; and (5) each defendant has a claim to a portion of the damages.
*743 Additionally, A & P contends that the lease was terminated by the appropriation, while Garfield asserts A & P owes rent pursuant to the lease in spite of the appropriation, for which it has instituted an action in the appropriate court, even while it claims for loss of rent against the State.
The court, upon settled law, rejects the contention of A & P that the appropriation terminated the lease. The law, as restated in numerous cases, seems to be that where only a portion of a leased property is taken by eminent domain, there is no eviction, and thus there is no breach of the landlord’s covenants, and the tenant consequently has no right of action against the landlord for the disturbance of his possession of the premises. (2 Nichols, Eminent Domain, § 5.23, subd. [3], p. 67; Folts v. Huntley, 7 Wend. 210; Dolman v. United States Trust Co. of N. Y., 2 N Y 2d 110.) A partial taking does no.t cancel the lease. The dominant judicial view seems to be that a condemnation of a part of a leasehold estate for a public use does not at law amount to an eviction; and, whether the fee or a mere easement is taken, the tenant still remains liable under his covenant to pay the rent originally reserved. (2 Nichols, Eminent Domain, § 5.23, subd. [3], p. 69). To ask this court to declare the lease cancelled as was requested by A & P is tantamount to a request to reform the lease entered into by the parties. Such action is alien to the purpose of the cause before the court or the power of the court, which in this instance is called upon only to determine what damage did the State inflict upon the owner and tenant by virtue of its appropriation of a portion of the premises. (Jahr, Eminent Domain, p. 195.)
Generally, absent a provision in the lease, the matter is governed by statute law providing for proportional reduction in rent. (Matter of Daly, 29 App. Div. 286.) Thus, if all or any part is taken, the tenant is entitled to be paid for his loss and an award should be apportioned between the owner and tenant according to their respective interests, the owner for damages to his reversion and the tenant for damage to his leasehold interest. (Pomeroy v. State of New York, 18 Misc 2d 377; Syracuse Grade Crossing Comm. v. Delaware, Lackawanna & Western R. R. Co., 197 Misc. 192, mod. on other grounds 263 App. Div. 930, affd. 290 N. Y. 632; Matter of Trustees of New York & Brooklyn Bridge, 137 N. Y. 95, 97; Matter of City of New York, 192 N. Y. 295.)
Whatever damage was sustained by the tenant to its leasehold will be reflected by the apportionment of the respective interests of owner and tenant in the total award resulting from the appropriation.
*744 Moreover, to ascertain whether the leasehold interest was damaged, the court must determine, first of all, whether the tenant’s rental obligation was less or more than the market value of such premises. If the rental obligation should be found to be more than the market value of the lease, the tenant would lose nothing by the appropriation and, therefore, would not be entitled to damages; if less, then the difference or “ bonus ” in favor of the tenant would form the basis for damages. ' ‘ Where the property thus taken is held under a lease the value to the lessee of his estate in the property is to be determined, and. that value is to be ascertained upon the same principles that are applied in ascertaining the value of the property as a whole. What is to be ascertained is the fair market value of the lease ’ ’. (Matter of City of New York [Delancey St.], 120 App. Div. 700, 708.) When that value, has been determined, the lessee is entitled to it, and no more.
The court determines from the evidence that the fair market value of said lease was $9,000 a year against a stipulated rental of $6,500 yearly to April 30,1964 and thereafter of $7,099 yearly to April 30, 1969.
Although the State’s appraiser gave no consideration to the five-year option period, the court is satisfied that A & P would have exercised said option if the appropriation had not occurred for the simple reason that it averaged at least $20,000 a year in profits, even though the store was much smaller than its modern supermarkets; and common sense as well as the weight of the testimony indicates A & P would remain.
Before we continue with regard to the feehold and leasehold claim, we should dispose of the other portions of both claims. The claimant A & P removed all the contents of the store. The inventory it filed at the trial did not disclose in what part of the store the fixtures were located although that matters little since it had removed all the fixtures. Therefore, A & P having passed its own judgment as to whether the contents were personalty or fixtures, it must be assumed that it determined the entire contents were either of no value or personalty, for which it may not be compensated, and therefore its claim for fixtures and removal thereof is dismissed (Aber-Dulberg v. State of New York, 12 N Y 2d 285).
It is the duty of the lessee to leave behind the alleged fixtures, for as soon as the appropriation takes place a “ sale ” has occurred, whereby the State purchases the fixtures for which it must pay (Aber-Dulberg, supra). A & P chose to disregard this obligation imposed upon it by law and may not now be heard to complain of its own acts.
*745 Likewise, A & P may not receive any compensation for loss of profits as such, since under our decisions future profits are considered uncertain and speculative and are not compensable. (Sparkhill Realty Corp. v. State of New York, 268 N. Y. 192; New York Cent. R. R. Co. v. Maloney, 234 N. Y. 208, 218; Matter of City of Rochester [Smith St. Bridge], 234 App. Div. 583, 587; Matter of Board of Water Supply, 121 Misc. 204, affd. 209 App. Div. 841.)
The court has considered in a different aspect the proof submitted with reference to profits made before the appropriation. Those profits are considered by the court as a factor whereby the economic value of the lease was found to be $9,000 per year.
With reference to the claim of Garfield, in addition to damages to the feehold, both direct and consequential, to be found herein, the court hereby allows an additional $10,000 for the necessary restoration of the front of the building, and also the sum of $10,235 for the rental value of the temporary easement which in this instance the court finds to have existed to the 13th day of August, 1963, when the State filed its certificate of termination. The State contends that inasmuch as the stated purpose for which the easement was taken was completed by April 24, 1961, the claimant is not entitled to any further rental for the easement after April 24, 1961, even though the State did not file its termination certificate of the easement until August 13, 1963. The State alleges that the claimant knew that the work on the road and sidewalk had been completed and, therefore, should have proceeded with the work of restoration of the building. The court does not accept this contention of the State, for the basis of the compensation in its opinion is not based upon the completion of the work for which a temporary easement was taken, but only upon the date of the extinguishment of the temporary easement by the State. It is not for the claimant to inquire as to whether or not his property is available when the contractor has completed his work, but it is up to the State to advise the claimant and the rest of the world that, the contractor having completed the work pursuant to the provisions of the temporary easement, the State is now satisfied with it, has no further use of the said temporary easement, and therefore files a termination certificate as required in the statute.
Subdivision 20 of section 30 of the Highway Law provides in part as follows:
‘ ‘ If the superintendent of public works shall determine subsequent to the appropriation of a temporary easement right in property * * * that the purposes for which such easement right was acquired have been accomplished and that the *746 use and occupancy of said property for state highway purposes are no longer necessary, and that, therefore, the term of such easement should be further limited * * * he shall make his certificate that the use and occupancy of such property for state highway purposes are no longer necessary * * * and that such easement right is thereupon terminated, released and extinguished. The superintendent of public works shall cause a copy of such certificate to be filed in the office of the department of state. Upon the filing of such certificate in the office of the department of state all rights acquired by the state in such property shall cease and determine.
‘ ‘ The superintendent * * * shall cause a copy of such certificate together with notice of the filing thereof in the office of the department of state to be mailed to the owner of the property affected * * * A further copy of such certificate and notice of filing shall be filed in the office of the recording officer of each county wherein the property affected is situated ”.
Ho one but the State would know whether or not it had any further use for the prerogatives it obtained pursuant to the temporary easement when the demolition contract was completed. That certificate delivered by the contractor to the State does not represent an unequivocal act on the part of the State showing >a clear intention to abandon the said easement, nor does it indicate that the legitimate use of said temporary easement by the State is no longer necessary to it. (Porter v. International Bridge Co., 200 N. Y. 234.) It seemed to this court that someone in the State’s employ who should have filed the termination certificate when the demolition was completed, fell asleep at the switch, and did not wake up until August 13, 1963. The court believes that the State maintained a legal dominion over the subject property until the termination certificate was filed, which represented a cloud on claimant’s title for which the State is now called upon to pay.
Garfield’s claim for loss of rent for the entire lease is disallowed as such. Its loss of rent for the period involved has been already discussed ante. It appeared at the trial that the claimant Garfield had instituted in the proper tribunal an action for rent due under the lease against A & P.
Having' thus disposed of all other portions of both claims, we shall now consider the damages to the fee and leasehold. The experts seemed to agree that the property was damaged some 22% plus. The court rounds out the damage to 25%, making allowances for necessary additional tearing down to provide a proper “ bind ” for the masonry work. The period of such damage is found by the court to run from June 30, 1960, *747 when A & P abandoned the premises and paid its last rent to Garfield.
The court computes the reasonable market value of the entire property before the appropriation to be $68,600, basing its land value on the market data submitted and determining the value of the building by the employment of the capitalization method as best adaptable to this taxpayer:
The land on which stood building which was 50 feet x
125 feet, we value at $400 a front foot............. $20,000
Corner influence applicables we found to be.......... 1,500
The adjoining lot to the rear, which was 25 feet x 100 feet, we value at $200 a front foot................. 5,000
Total Land Value ......................... $26,500
The building we value at $42,100, arrived at as follows:
Economic rent accepted at $9,000 per year, less expense of upkeep and management — which the court believes to be $3,200 per year, leaves a net income of $5,800.
Assuming then a fair rental of 6% on the land value of $26,500, this would equal $1,590, which when deducted from the total net income of $5,800 leaves a net income of $4,210 on the building, which we capitalize.
Thus, assuming on the $4,210 an 8% pure interest figured on a Band of Investment approach, to which we add a 2% recapture (on a 50-year life basis for the remodeled building) this would bring the total capitalization equation to 10%.
We then multiply $4,210 by 10 and the result is $42,100 which represents the value of the building.
Since the land and building were leased to A & P on a lease which ran to April 30, 1964 at $6,500 with a lease option for another 5 years at $7,099 per year, to arrive at the A & P leasehold interest we would figure the present worth of said lease from July 1, 1960 (the day after A ■& P vacated the premises) which represents a period remaining on the lease of 3 years, 10 months, plus the 5 years on the option, to which the court applies what it considers an appropriate Inwood factor of 7% which results in a coefficient of 3.387 for 3 years, 10 months, and 3.128 for the option period. This latter would be made up by subtracting the previous coefficient of 3.387 from the 9-year coefficient of 6.515. Having ascertained that for the remainder of the lease the “bonus” is $2,500 yearly, and for the option period the “ bonus ” is $1,900 yearly, we find the present worth of said lease to be $14,410.70, arrived at *748 by multiplying each “ bonus ” period by the above coefficients as follows: $2,500 times 3.387 = $8,467.50, and $1,900 times 3.128 = $5,943.20.
Since we have determined the entire taking by the State to have amounted to 25% or % °f the land and building, the tenant’s loss on the lease “ bonus ” would amount to % of the total present worth of the lease, or $3,602.68.
The court finds that the after value of the remainder was $37,700, made up as follows:
Land, $21,500. Based upon the then fair value of:
Front lot at $300 a front foot................ $15,000
Rear lot, same as before..................... 5,000
Corner influence ........................... 1,500
$21,500 $21,500
Building. The State’s expert testified that the value of the building in its present condidition is about $16,800. The court agrees with this amount, but deducts $600 more for the reason that the claimant will have to pay to remove the solid wall the State erected, against the front. Thus the court deems a present value of the building to be....................... 16,200
Total Value After.................. $37,700
Therefore, we compute the damage by deducting the after value from the before value:
Before value .............................. $68,600
Less after value ........................... 37,700
Damage........................... $30,900
The court finds that the damage figure of $30,900 includes $10,000 as the cost of curing the front of the building, in addition to the direct and consequential damage.
The court finds that the tenant has sustained damages in the sum of $3,602.68.
The court finds that Garfield, the landlord, has sustained damages, after deducting the tenant’s damage, in the sum of $27,297.32.
In addition to the above damages that the owner sustained, the court finds that the owner is entitled to the sum of $10,235 which the court finds to be the rental value of 'the temporary easement from October 30, 1959 to August 13, 1963, the date *749 that the easement was extinguished by the filing of the termination certificate, by which finding the court adopts the rental value found by the State’s expert.
The court finds that the total damages sustained by the owner Garfield amounts to $37,532.32, which amount it awards to the said Garfield with interest thereon from June 30, 1960 to December 30, 1960, and from October 25, 1961, to the date of entry of judgment herein.
The court awards to the claimant A & P the sum of $3,602.68, with interest thereon from June 30, 1960 to December 30, 1960, and from October 27, 1961, to the date of entry of judgment herein.
This constitutes the decision of the court in accordance with the provisions of CPLR 4213, subd. (b). Let separate judgments be entered accordingly.