Howard T. Hogan, J.
On December 18, 1967, the County of Nassau condemned for public use claimant’s property consisting of 29.4 acres of land, having 750 feet of frontage on the Atlantic Ocean together with improvements. Approximately one half the property (15.6 acres) was improved with a cabana and beach club complex. The remainder was practically vacant.
This property is perhaps the last of several condemnations by the county of beach club land in this area which began in the mid-1960’s. In some of the condemnations both parties agreed that the highest and best use was residential development (Matter of Town of Hempstead [Lido Beach], Sup. Ct. Nassau County, Index No. 7410/66). That decision relates the various zoning changes from commercial to residential and the change in character from commercial beach clubs to residential plots. Another condemnation of similar property in the same area zoned business (Matter of County of Nassau [Lido Blvd.], 67 Misc 2d 1065) established that there was no market for beach clubs. Bather the market showed a distinct preference for residential plots. The problem inherent in that case is very much the same as this — determining land value for property used as a beach and cabana club. In that case the property was found susceptible to either of two separate uses, and residential *556 land was worth more than land zoned for commercial use. This is what the court finds here.
VALUATION
Claimant’s appraiser using a summation approach estimated a total damage of $2,400,000- divided as follows:
Beach club land and buildings
(15.6 acres at $55,000) $1,569,000
Other land
(13.8 acres at $60,000) 828,000-
Petitioner’s appraiser also using a summation or cost method estimated the total damage at $1,736,000 as follows:
Land $1,325,000
Improvement 411,000-
SPECIALTY PROPERTY
The subject property, by virtue of its location, size and duality of highest and best use, is unique. The westerly 20 acres, improved with cabanas, lockers, snack bar, club house, swimming pools and other amenities, was a .specialty; The improvements were unique and were specially built for a specific purpose; it was being specially used at the time of the condemnation; there was no market for beach and cabana clubs and no sales for such use at the time; the improvements were appropriate and at the time of vesting its operation was economically .sound and it reasonably could be expected to be replaced. (Matter of County of Nassau [Lido Blvd.], supra; Matter of Port Auth. Trans-Hudson Corp. [Hudson Rapid Tubes Corp.], 20 N Y 2d 457.)
During the trial the parties stipulated the sound value of the improvements was $711,000.
Appraisers for both sides agreed that the use was at least a ‘ ‘ special type ’ ’ of use. With this the court concurs insofar as the 20 acres are concerned. The use being made of that part of the property met all the criteria. With respect to the remainder of 9.4 acres, entirely vacant, the court finds this portion was not a specialty property but rather had a different highest and best use — residential. In other words, the court finds there existed a duality of use for the entire tract.
Without question waterfront land on Long Island is highly desirable and commands a substantial return in the market. Especially is this true if its proximity to New York City is within easy commuting distance as was the subject property.
In the early 1950’s six private beach clubs were constructed along the ocean front on land rezoned for commercial use. Not all were successful. Then in the 1960’s some of this zoning was changed to allow residential one-family development. From *557 this it seems only reasonable to conclude that claimant’s easterly • 9.4 acres not used in its beach club operation would have been granted a change of zone to residential.
The subject parcel, rectangular in shape, had 750 feet frontage on the Atlantic Ocean running north some 1,700 feet to Lido Boulevard. All public utilities including sanitary sewers were available. The physical improvements on the westerly 20 acres were cabanas, lockers, swimming pools, club house, snack bar, tennis, hand ball courts, dance pavilion and parking area. The 9.4 acres on the east were mostly unimproved. Each must be valued for its highest and best use. (Sparkill Realty Corp. v. State of New York, 254 App. Div. 78, affd. 279 N. Y. 656.)
METHOD OF VALUATION
Since the evidence demonstrates that this was a viable and economically sound operation which could reasonably be expected to be replaced, value may be measured by the cost approach, as to the area used as a beach and cabana club which appears to have been 20 acres. Both parties stipulated at the trial that the sound value of the beach club improvements was $711,000 and the court adopts this figure.
The claimant’s appraiser valued the land devoted to club use at $55,000 per acre, or $858,000 for 15.6 acres, by analyzing and capitalizing the ground lease with modifications of the Atlantic Beach Club and others in the area. He determined the value of the easterly 13.8 acres by utilizing comparable sales of largé vacant tracts suitable for residential development in the immediate vicinity and adjusted these for plot yield per acre, time and size where necessary in order to reflect differences between them and that portion of the subject property under review, arriving at a value of $60,000 per acre or $828,000 for the vacant land.
Petitioner’s appraiser valued the entire parcel of 29.4 acres as if it were all business land, even though he testified that the highest and best use of 9.4 acres of vacant land east of the actual club was residential. Based on vacant land sales, three of which were utilized by claimant also, he found a value of $45,000 per acre or a total of $1,323,000 for the land. However, he deducted $300,000 from the stipulated sound value of the improvements which he attributed to economic obsolescence. It was his opinion that the land as utilized for a beach club was worth only $30,000 per acre. His $300,000 for economic obsolescence was based upon a deduction of $15,000 per acre from his $45,000 per acre figure for 20 acres which he arbitrarily determined were devoted to club use. This position is difficult to *558 reconcile with his finding that the beach clnb constituted the highest and best use of this part of the subject property.
His estimate of economic obsolescence was based upon his analysis of ground leases of three beach clubs in the Lido area. To him, these leases indicated a value of $30,000 per acre for land under beach club use. However, these leases which he capitalized were all executed more than 10 years before the vesting date and do not reflect the fair economic rent attributable fco the land in 1967. Petitioner’s expert did not even adjust for this time difference in his analysis. As such his opinion of economic obsolescence is entitled to little weight. In addition, the evidence supports a finding that this beach club was an economically sound and viable operation. This alone disproves the economic obsolescence. He further testified that residential land in the area was worth between $55,000 and $60,000 per acre. Coupled with his admission that at least 9.4 acres of the subject had a residential highest and best use, his over-all valuation of the entire subject property as business land is difficult to reconcile.
It is well settled that land must be valued in a use consistent with the improvements thereon. (Acme Theatres v. State of New York, 26 N Y 2d 385.) Hence, with respect to the westerly 20 acres devoted to beach club use, the court finds that claimant’s appraiser’s approach is more realistic. From market data he found a comparable ground lease of an operating beach club which reflected the land value when capitalized at the prevailing interest rate. This lease, however, had been modified in March, 1969, some 15 months after the vesting and its $65,000 net annual rent reflected rental values after the taking. This lease also suggests that there was no further land available for beach club development in the entire area after 1967, because of condemnations by the county and the Town of Hempstead. Nevertheless, this lease is of greater validity than the existing ground leases of the Lido clubs executed more than 10 years before vesting. It was the rents of these leases which were capitalized by petitioner’s appraiser.
From the evidence, the court finds that a net annual ground rent of $50,000 is the fair economic rental for the comparable as of the vesting date. By capitalizing this at 7%, which the court finds to be the interest rate at the time of vesting, the value of the comparable land is $714,285 or $51,535 per acre. Adopting claimant’s downward adjustment of 10% because of the greater ocean frontage of the comparable, we have an indicated value of $46,400 per acre, rounded.
*559 Accordingly, the court finds that the 20 acres of the subject property devoted to beach club use has a value of $928,000. With respect to the substantially vacant 9.4 acres of land suitable for residential development, the court has carefully analyzed the sales utilized by both appraisers.
Claimant’s appraiser found the highest and best use for the easterly portion of the property was residential, and he fixed a value of $60,000 per acre for that portion which he thought should be residentially zoned.
Petitioner’s appraiser testified that in this area, or “in this strip ”, as he called it, there were three values for land which he defined as follows: ‘ land value, as business, utilized as a beach club, which produces a land value; there is land value, free and clear, zoned business, which produces another land value; and there is land value, vacant unimproved available for residential development, which produces the highest land value of all.”
Since he agreed that the highest and best use for the easterly part of the land (9.4 acres) was residential, he estimated a range in value of between $55,000 and $60,000, or $57,000 per acre, vacant and available for residential development. Prom this, however, we must deduct certain necessary costs and expenses including carrying charges, engineering for preliminary subdivision plans as well as legal expenses which will be incurred in connection with a zoning change from commercial to residential, resulting in an indicated land value of $55,000 per acre as is.
GOIKG COXCEBE" VALUE
This beach club, known as The Colony ’ ’, was in operation each year from Memorial to Labor Day.
It was heated and air-conditioned and from the evidence was a successful operation. When the Commissioner of Recreation (Halper) visited the Colony during the latter part of 1966 to prepare for the transition, he met with one of the claimants (Roth). At that time and on several occasions, he discussed the turnover of the operation and sought to learn the general and mechanical operations of the club and “ actual handling of the membership ”. He was shown the membership rolls and noted the plan of operation. He sought and used these rolls and communicated with the patrons of Colony. Speaking in his capacity as the recreational director of the condemnor, he testified:
Q Did you have any discussion with him about how he handled his patrons?
A Well, yes. In a specialized way — if you want me to state it —
*560 Q Yes. What did you discuss with him?
A We were concerned, taking a new facility over, that it remain viable and in good public use. Our request of Mr. Roth was to allow us to see his membership rolls, to see what they were. We also did not want to have a disruption because there was a great deal of sentiment and a family habit pattern of people using those facilities to advise them of the turnover, and to allow an opportunity to enter into a contract with the County at the time when we became the owners or operators.
Q When you had this conversation with Mr. Roth about the membership rolls, what did .you say to him and what did he say to you; do you remember?
A He acceded to our request.
Q What was that request?
A Our request to allow us to see his membership rolls and to use it for our purposes in terms of communicating with the former members, which we did.
THE COURT: To communicate with former members for what purpose?
THE WITNESS: To advise them that the County was now becoming the operator óf the facility, and to invite them to continue their membership under our new regulations, and we sent such communications to them.
THE COURT: Do you have any copies of such communications ?
THE WITNESS: There must be on file such communications, or copies.
Q Did Mr. Roth furnish you his membership roll?
A He did.
Q In what form was that membership roll, Mr. Halper?
A I believe they were in addressograph plates.
Q Plates? .
A Yes.
Q Do you remember how many plates there were?
A Not really.
Q Did there come a time, when you utilized those plates?
A Yes, not as plates, but the information on the plates.
Q How did you utilize those?
A To get the addresses of the former patrons.
Q I take it, you used these plates and reduced them to a list of members?
A Right.
Q Of the club?
A People who had been former occupants.
Q Former patrons of the Colony Club?
A Right.
He testified that of all of the beach clubs, Colony was the best maintained.
When the county took over, it rented the same cabanas and lockers, used the same .swimming pools, tennis courts, snack bar, basketball and handball courts and recreational area. It leased the snack bar to a concessionaire, and the operation by the county “ was relatively the same ”. Both Colony and the county had day camp programs. Some of the differences in operation were: the county restricted use to Nassau County residente, it did not have valet parking, nor did it use the club house restaurant. He testified the Colony was an unique facility *561 and that the county ‘ maintained the same format * * * the only thing viable for the benefit of the public was to continue it as it was.”
The county did not construct any new or additional recreational facilities nor did it make use of the restaurant or dining room in the club house after vesting. The major difference in the operation of the club since vesting is that it is restricted to Nassau residents. However, the county solicited those Colony Beach Club members who were residents of the county; invited them to rent cabanas and to use the same facilities in much the same manner as they had been doing.
Despite all of this, the question presented is whether the county actually took over the operation of the Colony Beach and Cabana Club. If it did, the claimant is entitled to an additional award for the going concern value (intangible assets) which it claims in the sum of $175,000. (Matter of City of New York [Fifth Ave. Coach Lines], 18 N Y 2d 212, 22 N Y 2d 613; Matter of Port Auth. Trans-Hudson Corp. [Hudson Rapid Tubes Corp.], 20 N Y 2d 457, supra.)
Claimant contends that the county continued to operate a beach and cabana club in the same fashion and for most of the same people. While it is true that this case is distinguishable from the Shelbourne Beach Club in that the county obtained and used the Colony’s mailing list of patrons and invited the former members of Colony to rent cabanas or lockers and while the operation by the county was substantially the same as to cabanas, lockers, swimming pools, tennis, handball courts and snack bar, the county did not operate a restaurant or nightclub; it did not provide valet parking; its patrons were restricted to county residents. The county contends: The reason for taking the property was to keep a unique natural resource into the public domain ”.
Claimants seek damages for the ££ going concern value ” which is little different, if any, from good will. This has been excluded as an element of damage in New York except where the business has been taken over and operated for the public by the condemning authority. (Banner Milling Co. v. State of New York, 240 N. Y. 533; Garfield Homes v. State of New York, 44 Misc 2d 738.) ££ Good will ” in New York has been held not to be ££ property” in the constitutional sense that the condemning authority shall pay for it. (People ex rel. Burhans v. City of New York, 198 N. Y. 439; Banner Milling Co. v. State of New York, supra.) Our courts hold that “ good will ” of a business is not an element of damages! Yet, when an individual’s estate *562 is administered both Federal and State Governments find no difficulty in fixing a value .on the good will of his business for tax purposes, or when he sells his property with a going operation that, too, is measurable. Some call “ going concern value ” a variant of good will. It is really little more than a slight distinction with little, if any, difference.
In this instance there is no question that the claimant’s entire property was taken. The question is whether there are any interests, other than the land and improvements, for which the claimant is constitutionally entitled to compensation. Incidental losses in condemnation have generally been considered to be noncompensable in this State and others. The doctrine of damnum absque injuria to me has always been an immoral illogical concept and should be declared illegal. It has been severely attacked by legal scholars. Some courts under modern constitutional interpretation have rejected it. (Luber v. Milwaukee County, 47 Wis. 2d 271; cf. Jacksonville Express Auth. v. DuPree Co., 108 So. 2d 289, 291-292 [Fla. 1958].)
The reason for this rule lies in the belief that “ just compensation ” relates only to compensation for property as distinguished from damages to the owner. That is to say that “ just compensation ” under the constitution is strictly an in rem concept rather than in personam. Certainly the economic results of a condemnation affect the market value and since these economic losses are measureable in tax and other proceedings, is it fair or just that these be excluded in condemnation? Should the courts direct their attention solely to compensating the condemnee only for the physical property taken?
The courts in the Luber case (supra, pp. 279-280) noted: “ The importance of allowing recovery for incidental losses has increased significantly since condemnation powers were initially exercised in this country. * * * When such property is taken, incidental damages are very apt to occur and in some cases exceed the fair market value of the actual physical property taken. * * * Many states, realizing the injustice of denying recovery for other than the fair market value of the physical property actually taken, have created statutes ”.
However, it went on to note that such statutes were unnecessary for incidental losses are constitutionally required and should not be “a matter of legislative charity ”. It held the rule of damnum absque injuria under modern constitutional interpretation, unconstitutional insofar as it limits compensation. The implication of this case relating to loss of profits, good *563 will, etc., is a clear break with long tradition and has been too long in coming.
The instant case is not the typical situation where the condemnor has taken land and improvements for road widening or other public improvements. Here, the condemnor acquired a going beach and cabana club which was operating at a profit. The condemnor after the appropriation continued to operate the facility in much the same fashion as it had been operated by the condemnee, except that it did not make use of the clubhouse dining room save for an occasional meeting, nor does it operate a nightclub, nor do any catering, nor does it have valet parking, nor are the patrons club members. All using the facility must be residents of the county.
But it did do the following:
1. It rents the cabanas and lockers;
2. It maintains .and operates the swimming pools, tennis and hand ball courts, and the beach;
3. It operates the snack bar;
4. It operates a day camp;
5. It uses the club’s personal property sold by the condemnee to the condemnor in the operation;
6. It uses the club’s furniture, fixtures and cooking utensils at the snack bar and around the pool, and operates generally in the same fashion as did the condemnee;
7. It “ maintained the same format ”.
For these reasons the claimant contends it is entitled to compensation for loss of its “ going concern value ”. The evidence shows that the condemnor herein has interrupted the successful operation of a beach and cabana club by soliciting its members resident in Nassau County from its list of members and by continuing the operations in much the same fashion as a public enterprise. The condemnor has not only taken land and improvements, but the business as well.
This is not a situation where only the land and buildings were condemned. It is much more. Here, the condemnor took over not only the land and the improvements but it took over and continues to operate a going concern as a public enterprise. What we have is merely a change of management. “ When the condemnor appropriates the control, management and ownership of the business, it acquires not only the physical assets of the business but the good will. In this respect, the case is much different when only the land upon which the business is conducted is condemned.” (4 Nichols, Eminent Domain, § 13.31, p. 13-181.)
*564 The rule, of course, is that good will is not compensable and that good will survives. (Mitchell v. United States, 267 U. S. 341.) That it is “ generally considered too speculative to merit compensation ” (4 Nichols, Eminent Domain, supra, p. 13-182).
The finite distinction between good will and going concern value rests upon the income although both terms are used interchangeably. The former is speculative; the latter is measurable. Going concern value is predicated upon an estimate of future profits and relates to the superior productiveness of a well-operated, successful business or plant and its sound future potential. Good will is intangible and arises from reputation of a business and relates more to the personality of those conducting the business and the favor, reputation or advantage it may have. Good will, per se, is not compensable in New York.
The court finds the going concern value measureable and an asset for which just compensation must be paid as provided in the Constitution. Certainly, the condemnee has a right to be compensated for the value of this business as well as the land and improvements. It is not unreasonable to find that a purchaser would pay more for this property with a .successful going business than if there were no business at all. (McCardle v. Indianapolis Water Co., 272 U. S. 400; Kimball Laundry Co. v. United States, 338 U. S. 1.)
The testimony shows that in the 1966 year of operation there was a gross of $435,284. Claimant contends the going concern value of the intangible assets of the beach and cabana club was $175,000. Of this sum, approximately $20,000 was attributable to training and developing personnel. Since the condemnor did not take over or retain any of Colony’s staff, this item is disallowed, leaving a remainder of $155,000. Of this remainder it is clear from the evidence the extent of the take over of this business was 50%. Accordingly, the court finds that the going concern value of the intangible assets condemned is $77,500.
Moreover, the compensation to claimant for going concern value is based upon the loss suffered by the owner, not on the benefit received by the condemnee. The beneficial use to the condemnor is not a factor to be considered in determining market value for that is irrelevant. It is only what the owner has lost (Merced Irrigation Dist. v. Woolstenhulme, 4 Cal. 3d 478; 4A Nichols, Eminent Domain, § 15.44; Onondaga County Water Auth. v. New York Water Serv. Corp., 285 App. Div. 655; Matter of City of New York [Fifth Ave. Coach Lines], 18 N Y 2d 212, 22 N Y 2d 613, supra).
*565 DE FACTO TAKING
Claimant contends that on October 1,1967, some two and one-half months before the vesting order, the county entered the property, interfered with the rights of the owner and asserted complete dominion. For this, additional compensation is sought.
The managing officer of Colony testified that after Labor Day, Colony only kept two employees on its payroll for about a month for cleaning up and winterizing some of the facilities. It had been the custom of Colony after Labor Day to lease the premises to a caterer until May of the following year. While it is true that security guards were brought in by the county about Labor Day, 1967, it was for the sole purpose of protecting these very same facilities from vandalism and/or the elements.
Moreover, while three county employees were also working in the Colony Club office during this period reviewing the membership list, they in no way interfered with Colony or its work in closing. For all intents and purposes Colony relinquished control within a month after Labor Day as had been its custom when it normally leased to a caterer. To constitute a de facto taking the acts of the condemnor in entering and taking possession must be such that the condemnee’s rights to the use of his property have been lost.
In other words, there must be a permanent ouster of the owner or there must be evidence that his possession has been disturbed to the extent of a direct legal restraint on his use. (City of Buffalo v. Clement Co., 28 N Y 2d 241, 255; Leeds v. State of New York, 20 N Y 2d 701; City of Buffalo v. George Irish Paper Co., 31 A D 2d 470.)
The evidence here falls short of a direct legal restraint upon the fee title and use by the claimant. Bather, it is to be noted that on January 30, 1968 (after vesting), the claimant herein appeared in court and consented to a final order of eviction based upon a stipulation between the parties, which order provided for a stay until March 31,1968.
For a de facto taking there must be an appropriation of the property in its strict legal sense. (Niagara Frontier Bldg. Corp. v. State of New York, 33 A D 2d 130, affd. 28 N Y 2d 755; Kimball Laundry Co. v. United States, 338 U. S. 1, supra.) It is clear that a de facto taking requires not only a physical entry by the condemnor but a physical ouster of the owner; that is, interference with the physical use, possession and enjoyment of his property, City of Buffalo v. Clement Co. (supra). The evidence in this case fails to demonstrate any acts on the part of the condemnor which could be construed as an assertion of *566 dominion or control. (City of Detroit v. Cassese, 376 Mich. 311.) In the light of these facts there was not a de facto taking and damages must, therefore, be measured from the time of the de jure taking, which, of course, limits interest from the later de jure taking date. (City of Buffalo v. Clement, 28 N Y 2d 241, supra; 4 Nichols, Eminent Domain, § 12.3151 [5].)
Based on all the evidence, and the court having inspected the property, the court finds and decides as follows:
DAMAGE PARCEL NOS. 3 AND 4:
LAND
20 acres at $46,400 $928,000
9.4 acres at $55,000 517,000
improvements 711,000
GOING CONCERN VALUE 77,500
total $2,233,500
The County Attorney is directed to submit a partial tentative decree accordingly.